UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
GATEWAY, INC., and GATEWAY  :
COMPANIES, INC.,
 : Case No. 07cv6732-CM
              Plaintiff,    ECF CASE
 :
vs.
 : **COMPLAINT**
ACS COMMERCIAL SOLUTIONS, INC.
 : **JURY TRIAL DEMANDED**
              Defendant.
 :
------------------------------------x

      Come Now GATEWAY, INC., ("GI") and GATEWAY COMPANIES, INC., ("GCI"), collectively ("GATEWAY") and for their cause of action against ACS Commercial Solutions, Inc., ("ACS") for breach of contract, benefits administration malpractice and breach of fiduciary duty state as follows:

## PARTIES

    1.    GI is a Delaware corporation with a principal place of business in Irvine, California. GI is a citizen of the states of Delaware and California.

    2.    GCI is a Delaware corporation with a principal place of business in Irvine, California. GCI is a citizen of the states of Delaware and California.

    3.    ACS is a Nevada corporation with a principal place of business in Dallas, Texas. ACS is a citizen of the states of Nevada and Texas.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this case, pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs and is between parties of diverse citizenship.

5. In the alternative, this Court has jurisdiction over Count III under 29 U.S.C. §1132 in that this Court arises under the Employee Income Security Act of 1974 ("ERISA") and has jurisdiction over Counts I and II under 28 U.S.C., §1367 in that Counts I and II arose out of the same set of operative facts.

6. Venue is appropriate in the United States District Court for the Southern District of New York because the occurrences in the Complaint took place across the United States and the parties have agreed to venue in the Southern District of New York in the contract at issue in the case.

## THE CLOSE CONTRACTUAL RELATIONSHIP OF GATEWAY AND ACS

7. Gateway is in the business of manufacturing, distributing and selling computers and associated electronics throughout the United States. Gateway is, and since its inception has been, an innovator in the manufacturing and marketing of home and business computers.

8. ACS is in the business of providing management services including third-party administration of benefits such as health and dental benefits to companies such as Gateway.

9. ACS insists that it can deliver "higher quality, increased productivity and lower costs" through "innovative and effective outsourcing." ACS touts a "can do attitude" and believes the "impossible is possible" by virtue of such an attitude.

10. ACS claims that through "a passion and energy" – which they refer to as *"hustle"* – they allow their "clients to focus on their core business goals."

## GATEWAY GETS "HUSTLED"

11. During the ACS Administration Period (defined below) Gateway's business model was changing to meet the rapidly changing world of computer technology.

12. Gateway and ACS entered into a contract dated September 30, 2003 entitled "Business Process and Information Technology Services Agreement" ("Master Agreement"). The Master Agreement covered all of the services provided by ACS to Gateway including administration of benefits.

13. In entering into the Master Agreement, Gateway turned over virtually all of its Human Resources, Information Technology, and Accounting department operations to ACS so that Gateway could focus on its core business goals – manufacturing, distributing, and selling computers. Pursuant to the Master Agreement, ACS took control of many human resource functions including payroll and benefits, as well as most information technology functions. Gateway maintained only a minimal staffing on its payroll to oversee ACS's compliance with its contract. Under the Master Agreement, Gateway trusted and relied on ACS to deliver the type of high quality services ACS advertised and promised.

14. Gateway has a self-funded health, dental, and vision employee benefits plan ("Gateway Health Plan"). The Gateway Health Plan is not unusual in any way and should not have presented any challenges to a third-party benefits administration company such as ACS.

15. Under the Gateway Health Plan, Gateway is directly responsible for the payment of healthcare costs incurred by participants and beneficiaries in the Plan.

16. Pursuant to the Master Agreement, Gateway engaged ACS to administer the Gateway Health Plan.

17. The services to be provided by ACS to Gateway in relation to the Gateway Health Plan are set forth in the "HR Statement of Work Exhibit HR2.1 Compensation, Benefits and Reward Services" ("Benefits Addendum"). The services contemplated by the Benefits Contract were ordinary third party administration of a health, dental, and vision plan with terms and conditions commonly found in plans of its type. The services required were anything but "the impossible" and were well within the ambit of an average third party administrator.

18. Pursuant to the Master Agreement and the Benefit to Addendum ("Benefit Contract") ACS administered claims for the Gateway Health Plans with dates of service from April 1, 2004 to December 31, 2005 ("ACS Administration Period").

19. During the ACS Administration Period, participants and beneficiaries of the Gateway Health Plan, as well as health care providers on behalf of participants and beneficiaries of the Gateway Health Plan, sent claims for payment to ACS (the "Claims").

20. ACS received and processed the Claims.

21. ACS' processing activities with respect to the Claims ("Services") included, but were not limited to, the following:

    a. Verifying that the person receiving the service resulting in the claim was eligible for benefits;

    b. Verifying that the procedure or service rendered was covered by the Gateway Health Plan;

    c. Verifying that a co-pay or deductible had been collected and/or applied;

STLDOCS 205347v1

   d. Applying any discounts applicable to the service provided in accord with the contract in place between Gateway and/or ACS and the healthcare providers;

   e. Adjudicating disputes concerning claims; and

   f. Paying claims on Gateway's behalf.

22. In order to facilitate payment of Claims, Gateway established a bank account into which it deposited millions of dollars. ("Gateway Account").

23. During the ACS Administration Period, ACS processed the Claims, adjudicated the Claims and, at its discretion, issued payment to participants, beneficiaries, and health care providers from the Gateway Account ("ACS Payments") in satisfaction of the claims.

24. Periodically, Gateway deposited additional sums in the Gateway Account to provide additional funds for the ACS Payments.

### ACS FAILS TO "HUSTLE" AND MAKES THE "POSSIBLE" "IMPOSSIBLE"

25. Pursuant to the Benefits Contract, Gateway engaged an outside auditor (the "Auditor") to review the ACS Payments.

26. The Auditor reviewed nearly every single Claim – 143,601 records – for the period April 1, 2004 to May 4, 2005 and discovered that ACS had improperly processed over 13% of the Claims. ACS' appalling failure to correctly process the Claims resulted in the payout of millions upon millions of dollars from the Gateway Account in the form of overpaid Claims. Moreover, the Auditor believes that it will find even more errors when it reviews the remaining Claims processed by ACS.

27. The Auditor's discoveries concerning ACS's failures in connection with their services were shocking not only because of the sheer volume, but also because ACS's failures were basic and repeated. For example, ACS's mistakes included the following:

a. **Coverage Eligibility Failures**: ACS paid hundreds of thousands of dollars for claims by individuals who were not covered by the Gateway Health Plan. For example, ACS routinely paid claims for individuals and their dependants who were no longer employed by Gateway and whose coverage had terminated. Additionally, ACS paid claims for individuals and their dependants whose coverage had yet to begin. Furthermore, ACS paid claims for ineligible individuals, such as dependents over the age of eighteen who were not designated as full time students. These coverage failures were particularly egregious because ACS was responsible for Gateway's payroll and therefore had first hand knowledge of the status of each Gateway employee.

b. **Co-pay Failures**: ACS repeatedly failed to debit the service provider payments for collection or application of the co-payments specified in the Plan to be paid by the member at the time of service. Instead of these co-pay amounts being made by members, they were instead made by Gateway which resulted in hundreds of thousands of dollars in overcharges to Gateway.

c. **"Global Reimbursement" Failures**: ACS repeatedly paid claims for services which should have been included in a "global" reimbursement. Often surgical and other procedures require a series of visits to a physician and/or other health care professional. Typically, the services for the course of treatment are billed as one amount for all necessary visits which fall within a pre-define period of time called the "Global Period". The Global Periods for all procedure codes are defined by the Center for Medicare and Medicaid Services "CMS" and are followed as a standard industry-wide. In many cases, ACS ignored the global period and paid providers for each visit resulting in gross overpayment of the provider. As a result, physicians were improperly paid

STLDOCS 205347v1

additional amounts for follow-up services which should have been covered by their original reimbursement.

    d.    **Anesthesia Billing Failures**: ACS routinely paid anesthesiologists for the total time in which a patient had an epidural anesthetic applied. The correct claim adjudication procedure should have been to reimburse a fixed amount based on the provider contract, or at most, make a reimbursement only for the time the anesthesiologist was actually present, either administering, removing or physically monitoring the patient. ACS also issued payments for anesthesia claims where the billing units did not agree with the time the patient was in surgery. Therefore many payments to anesthesiologists were hundreds or thousands of dollars more in each instance of administration of an epidural which resulted in hundreds of thousands of dollars in total overpayments.

    e.    **Documentation Failures**: Certain procedures such as cosmetic surgery or weight loss surgery are covered by the Gateway Health Plan only in limited situations. For these types of procedures the proper documentation must be submitted to support eligibility for reimbursement. For example, cosmetic surgery may be covered if it is necessary to treat injuries resulting from an accident, but is not covered simply to improve body aesthetics. ACS repeatedly failed to collect the back-up documentation necessary to justify a variety of expensive and often unnecessary procedures. Documentation failures such as these make it doubtful that the procedures should have been approved.

    f.    **Third-party Reimbursement Failures**: The Gateway Health Plan pays claims without regard to fault. As such, individuals injured in auto accidents or work-

STLDOCS 205347v1

related accidents are often treated and the treatment paid for by the Gateway Health Plan. The Gateway Health Plan has a right to recover its payment from those persons responsible for the injuries other than the covered person. ACS failed to pursue third-party reimbursement claims in which a third-party would have been liable for the Claim. As a result, ACS paid hundreds of thousands of dollars in Claims which should have otherwise been paid for by third parties.

28.  The Master Agreement's audit provision states that ACS shall promptly pay Gateway the amount of the overcharge, plus interest. Furthermore, the Master Agreement goes on to state that where an audit reveals an overcharge to Gateway of more than 5%, ACS shall reimburse Gateway for the costs of the audit. To date, Gateway has incurred over $405,000 to conduct the audit described above. ACS has refused to repay the overcharges and audit costs to Gateway.

29.  The Master Agreement also entitles Gateway to collect its attorneys' fees from ACS. Gateway has incurred, and will continue to incur, attorneys' fees in its attempt to make itself whole as a result of ACS's repeated failures.

30.  The Master Agreement called for service level bonuses for compliance or penalties for lack of compliance with the contract. Throughout the ACS Administration Period, ACS reported that it had met its goals and collected the service level bonuses from Gateway. In reality, ACS's performance was so poor that it was not entitled to the millions of dollars it received in service level bonuses.

### ACS'S "CAN'T DO" ATTITUDE

31.  When Gateway learned of ACS's numerous failures and breach of trust, Gateway attempted to resolve its complaints with ACS using the mechanisms contained in the Master

Agreement. For 13 months Gateway communicated – both formally and informally – with various employees of ACS in an effort to resolve its grievances. ACS listened to Gateway's requests, but refused to refund even one dollar and failed to resolve any Claims disputes with Gateway.

32.  As part of Gateway's extensive efforts to negotiate a non-litigated resolution to ACS inexcusable failures to properly administer Gateway's benefits, Gateway provided detailed examples of ACS's mistakes. In response, ACS agreed that in numerous instances it made errors which resulted in ACS overpaying Claims (using Gateway's money). Nonetheless, ACS has failed to refund any overpayment and continues to contend that it did nothing wrong.

33.  In addition to the errors which caused monetary damage, ACS repeatedly failed to provide reports and/or data required by the Benefit Contract such as call volume reports, flexible spending account reports, and data sufficient to file statutorily required reports with the State of New York, which ultimately resulted in Gateway paying penalties for late submissions of reports.

## COUNT I

## BREACH OF CONTRACT

34.  Gateway realleges and incorporates by reference, paragraphs 1 – 33 as if set forth in full herein.

35.  ACS's action in failing to properly administer and regularly pay claims constituted a breach of the Benefits Contract.

36.  Gateway was damaged by ACS's breach of the Benefits Contract in an amount to be determined at trial, but believed to be in excess of millions of dollars.

WHEREFORE, Gateway prays that this Court enter its judgment in its favor and against ACS in an amount in excess of $75,000.00 exclusive of interests and costs representing the Overpayments, its attorneys fees and its audit fees and expenses, taxing costs in favor of Gateway and against ACS and for such other and further relief as this Court finds just and proper.

## COUNT II

## NEGLIGENCE

37. Gateway realleges and incorporates by reference paragraphs 1-36 of this Complaint as if set forth in full herein.

38. ACS held itself out as an expert in the administration of health and dental benefits and undertook a duty to properly pay the Claims.

39. By overpaying the Claims, ACS breached its duty to Gateway.

40. Gateway was damaged by ACS's breach of its duty in an amount to be determined at trial, but believed to be in excess of millions of dollars.

WHEREFORE, Gateway prays this Court enter judgment in its favor and against ACS in an amount in excess of $75,000 exclusive of interest and costs, taxing costs in favor of Gateway and against ACS and for such other and further relief as this Court finds just and proper.

## COUNT III

## BREACH OF FIDUCIARY DUTY- ERISA

41. Gateway realleges and incorporates by reference paragraphs 1-40 of its Complaint as if set forth in full herein.

42. The Gateway Health Plan is a welfare benefit plan as defined by 29 U.S.C. §1002.

43. ACS is a fiduciary with respect to the Gateway Health Plan as that term is used in 29 U.S.C. §§1104 and 1109.

44. Gateway is a fiduciary with respect to the Gateway Health Plan as that term is used in 29 U.S.C. §§1104 and 1109.

45. As a fiduciary, ACS owed Gateway, as co-fiduciary, and the participants and beneficiaries of the Gateway Health Benefits Plan a duty under 29 U.S.C. §1104 to pay claims accurately so as not to waste the assets of the plan.

46. ACS breached its fiduciary duty to Gateway, the participants and beneficiaries of the Gateway Health Plan by failing to process the Claims in an appropriate manner.

47. Gateway and the participants and beneficiaries have been damaged in an amount to be determined at trial, but believed to be in excess of millions of dollars.

WHEREFORE, Gateway prays this Court enter judgment in its favor and against ACS in an amount in excess of $75,000 exclusive of interest and costs, for its attorneys' fees and audit fees and its expenses expended herein, taxing costs in favor of Gateway and against ACS, and for such other and further relief as this Court finds just and proper.

STLDOCS 205347v1

Dated:
July 26, 2007

Respectfully submitted,

LATHROP & GAGE L.C.

*/s/ Bernadette R. Reilly*
Thomas H. Curtin (TC-5753)
Bernadette R. Reilly,(BM-4117)
230 Park Avenue, Suite 1847
New York, NY 10169
Telephone: (212) 850-6220
Telecopier: (212) 850-6221

Attorneys for Plaintiffs, Gateway, Inc., and Gateway Companies, Inc.

OF COUNSEL:

John T. Walsh (#33874)
The Equitable Building, Suite 1300
10 South Broadway
St. Louis, Missouri 63102-1708
Telephone: (314) 613-2500
Telecopier: (314) 613-2550

STLDOCS 205347v1