# DEFENDANT'S

# EXHIBIT A

CONFIDENTIAL



**BUSINESS PROCESS AND INFORMATION TECHNOLOGY SERVICES AGREEMENT**

**By and Among**

**Gateway, Inc.,**

**Gateway Companies, Inc.**

**and**

**ACS Commercial Solutions, Inc.**

**September 30, 2003**

420079 v9/HN
904v09!.DOC

## TABLE OF CONTENTS

PAGE

1.   DEFINITIONS AND CONSTRUCTION ........................................................................ 1
     1.1   Definitions ....................................................................................................... 1
     1.2   Interpretation .................................................................................................. 1
     1.3   Order of Precedence ....................................................................................... 2
2.   TERM ........................................................................................................................... 2
     2.1   Initial Agreement Term ................................................................................. 2
     2.2   Renewal and Extension .................................................................................. 2
3.   SERVICES .................................................................................................................... 2
     3.1   Base Services Defined .................................................................................... 2
     3.2   Provision of Services ...................................................................................... 3
     3.3   Improved Technology ..................................................................................... 4
     3.4   Governmental Approvals ............................................................................... 4
     3.5   Laws ................................................................................................................ 5
     3.6   Existing Technology; Architecture and Standards ....................................... 6
     3.7   Knowledge Sharing ........................................................................................ 6
     3.8   Insourcing; Right to Use Third Parties ......................................................... 6
     3.9   Reports ............................................................................................................ 6
     3.10  Procurement ................................................................................................... 7
4.   TRANSITION ............................................................................................................... 7
     4.1   Transition Services ......................................................................................... 7
     4.2   Transition Milestones ..................................................................................... 8
     4.4   Cooperation with Third Parties ..................................................................... 9
5.   NEW SERVICES .......................................................................................................... 9
     5.1   New Services ................................................................................................ 10
     5.2   Fees for New Services .................................................................................. 10
     5.3   Third-Party Services .................................................................................... 10

TABLE OF CONTENTS
(CONTINUED)

PAGE

6.    GATEWAY RESPONSIBILITIES ................................................................. 10
      6.1    Gateway Relationship Manager ...................................................... 10
      6.2    Gateway Resources .......................................................................... 10
      6.3    Use of Gateway Facilities ................................................................ 11
7.    ADMINISTRATION OF ASSIGNED AGREEMENTS AND MANAGED
      AGREEMENTS........................................................................................... 12
      7.1    Managed Agreements ...................................................................... 12
      7.2    Managed Agreement Invoices ........................................................ 12
      7.3    Assigned Agreements ...................................................................... 12
      7.4    Assigned Agreement Invoices ........................................................ 13
      7.5    Performance Under Agreements .................................................... 13
8.    SERVICE LEVELS ...................................................................................... 13
      8.1    Service Levels .................................................................................. 13
      8.2    Review of Service Levels ................................................................ 13
      8.3    Root-Cause Analysis ....................................................................... 13
      8.4    Measurement and Monitoring Tools.............................................. 14
      8.5    Continuous Improvement and Best Practices ................................ 14
      8.6    Service Level Credits....................................................................... 14
9.    CUSTOMER SATISFACTION AND BENCHMARKING ........................... 14
      9.1    Customer Satisfaction Surveys ...................................................... 14
      9.2    Disputes............................................................................................ 15
      9.3    Benchmarking Overview ................................................................ 15
      9.4    Benchmarking Process..................................................................... 15
10.   SERVICE LOCATIONS .............................................................................. 16
      10.1   Service Locations............................................................................. 16
      10.2   New Service Locations .................................................................... 17
      10.3   Safety and Physical Security Procedures ....................................... 17
      10.4   Data Security.................................................................................... 17
      10.5   Protection of Gateway Data and Gateway Confidential Information.................. 18
11.   HUMAN RESOURCES ................................................................................ 18

TABLE OF CONTENTS
(CONTINUED)

PAGE

| | | | |
|---|---|---|---|
| 12. | | SUPPLIER STAFF | 18 |
| | 12.1 | Supplier Account Executive | 18 |
| | 12.2 | Key Supplier Personnel | 18 |
| | 12.3 | Supplier Staff | 19 |
| | 12.4 | Subcontractors | 20 |
| | 12.5 | Conduct of Supplier Personnel | 21 |
| | 12.7 | Assignment to Competitors | 21 |
| 13. | | MANAGEMENT AND CONTROL | 22 |
| | 13.1 | Governance | 22 |
| | 13.2 | Policies and Procedures Manual | 22 |
| 14. | | PROPRIETARY RIGHTS | 23 |
| | 14.1 | Ownership of Background Technology | 23 |
| | 14.7 | Systems | 24 |
| | 14.11 | Further Assurances | 26 |
| | 14.12 | Web Development | 26 |
| | 14.13 | Source Code Escrow | 26 |
| 15. | | DATA | 27 |
| | 15.1 | Ownership and Use of Gateway Data | 27 |
| | 15.2 | Correction and Reconstruction | 27 |
| | 15.3 | Provision of Data | 28 |
| | 15.4 | Data Privacy | 28 |
| 16. | | CONSENTS | 28 |
| 17. | | CONTINUED PROVISION OF SERVICES | 28 |
| | 17.1 | Disaster Recovery Plan | 28 |
| | 17.2 | Force Majeure | 29 |
| | 17.3 | Alternate Source | 29 |
| | 17.4 | No Payment for Unperformed Services | 29 |
| | 17.5 | Allocation of Resources | 29 |
| 18. | | PAYMENTS | 30 |
| | 18.4 | Fee Disputes | 30 |

TABLE OF CONTENTS
(CONTINUED)

PAGE

|  |  |  |  |
|---|---|---|---|
|  | 18.5 | Substantial Changes in Resource Baselines | 30 |
|  | 18.7 | Due Diligence. | 31 |
|  | 18.8 | No Other Charges | 31 |
| 20. | AUDITS | | 32 |
|  | 20.1 | Services | 32 |
|  | 20.2 | Fees | 33 |
|  | 20.3 | SAS 70 Audit and Other Audits. | 34 |
|  | 20.4 | Record Retention | 34 |
|  | 20.5 | Facilities | 34 |
| 21. | CONFIDENTIALITY | | 34 |
|  | 21.2 | Attorney-Client Privilege | 35 |
| 22. | REPRESENTATIONS AND WARRANTIES | | 35 |
|  | 22.1 | By Gateway | 35 |
|  | 22.2 | By Supplier | 36 |
|  | 22.3 | Disclaimer | 36 |
| 23. | ADDITIONAL COVENANTS | | 36 |
|  | 23.1 | By Gateway | 37 |
|  | 23.2 | By Supplier | 37 |
| 24. | DISPUTE RESOLUTION | | 38 |
|  | 24.1 | Resolution Procedures | 38 |
|  | 24.2 | Exclusions | 39 |
|  | 24.3 | Continuity of Services | 39 |
| 25. | TERMINATION | | 39 |
|  | 25.1 | Termination for Convenience | 39 |
|  | 25.2 | Termination for Change in Control of Gateway | 39 |
|  | 25.3 | Termination for Change in Control of Supplier or Supplier's Parent | 40 |
|  | 25.4 | Termination for Cause | 40 |
|  | 25.5 | Termination for Failure to Provide Critical Business Functions | 40 |
| 26. | TERMINATION FEES | | 41 |
|  | 26.1 | Termination Fees | 41 |

TABLE OF CONTENTS
(CONTINUED)

PAGE

|  | 26.2 | No Other Termination Fees. | 41 |
| 27. | | TERMINATION ASSISTANCE AND EXIT RIGHTS | 41 |
|  | 27.1 | Termination Assistance | 41 |
|  | 27.3 | Exit Rights | 42 |
| 28. | | INDEMNITIES | 44 |
|  | 28.1 | Indemnity by Gateway | 44 |
|  | 28.2 | Indemnity by Supplier | 45 |
|  | 28.3 | Indemnification Procedures | 47 |
| 29. | | DAMAGES | 47 |
|  | 29.1 | Consequential Damages | 47 |
|  | 29.2 | Direct Damages | 47 |
|  | 29.3 | Basis of the Bargain | 48 |
|  | 29.4 | Exclusions | 48 |
| 30. | | INSURANCE | 48 |
|  | 30.1 | Documentation | 48 |
|  | 30.2 | Types and Amounts | 49 |
|  | 30.3 | Policy Requirements | 50 |
|  | 30.4 | Providers of Non-Critical Services. | 50 |
|  | 30.5 | Risk of Loss | 50 |
| 31. | | MISCELLANEOUS PROVISIONS | 50 |
|  | 31.1 | Assignment. | 50 |
|  | 31.2 | Notices | 51 |
|  | 31.3 | Counterparts | 52 |
|  | 31.4 | Relationship | 52 |
|  | 31.5 | Non-Exclusivity | 52 |
|  | 31.6 | Consents, Approvals and Requests | 52 |
|  | 31.7 | Severability | 52 |
|  | 31.8 | Waivers | 52 |
|  | 31.9 | Timing and Cumulative Remedies | 52 |
|  | 31.10 | Entire Agreement | 53 |

TABLE OF CONTENTS
(CONTINUED)

PAGE

31.11   Amendments ................................................................................. 53
31.12   Survival ....................................................................................... 53
31.13   Third-Party Beneficiaries ............................................................. 53
31.14   Governing Law and Venue ........................................................... 53
31.15   Covenant of Further Assurances ................................................... 53
31.16   Bankruptcy ................................................................................. 53
31.17   Export ......................................................................................... 54
31.18   Conflict of Interest ...................................................................... 54
31.21   Publicity ...................................................................................... 54
31.22   Good Faith and Fair Dealing ........................................................ 55

CONFIDENTIAL

## BUSINESS PROCESS AND INFORMATION TECHNOLOGY SERVICES AGREEMENT

THIS BUSINESS PROCESS AND INFORMATION TECHNOLOGY SERVICES AGREEMENT (the "Agreement"), dated as of September 30, 2003, is by and among GATEWAY, INC. ("Gateway"), a Delaware corporation, GATEWAY COMPANIES, INC. ("GCI"), a Delaware corporation and a wholly owned subsidiary of Gateway, and ACS COMMERCIAL SOLUTIONS, INC. ("Supplier"), a Nevada corporation and a wholly owned subsidiary of Affiliated Computer Services, Inc., a Delaware corporation ("Parent").

### RECITALS

WHEREAS, Supplier desires to provide to Gateway, and Gateway desires to obtain from Supplier, the business process and information technology services and related services described in this Agreement on the terms and conditions set forth in this Agreement;

WHEREAS, Gateway and Supplier have engaged in extensive negotiations and discussions that have culminated in the formation of the relationship described in this Agreement.

NOW, THEREFORE, for and in consideration of the agreements set forth below, Gateway and Supplier agree as follows:

1. **DEFINITIONS AND CONSTRUCTION**

    1.1 **Definitions.** Capitalized terms used in this Agreement have the meanings set forth on **Exhibit 1**.

    1.2 **Interpretation.**

    (a)     The Exhibits attached to this Agreement are hereby incorporated into and deemed part of this Agreement. All references to "Agreement" herein include all Exhibits to this Agreement, and all references to "Exhibits" herein include all Attachments to such Exhibits.

    (b)     Headings preceding the text of Sections, and headings to Exhibits, Attachments, the table of contents and the table of Exhibits included in or attached to this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

    (c)     Any reference to a Section, Exhibit or Attachment will be to such Section, Exhibit or Attachment of this Agreement, unless otherwise expressly provided.

    (d)     References to any Law refer to such Law in changed or supplemented form, or to a newly adopted Law replacing a previous Law.

    (e)     The use of the term "including" and inflections thereof, or of the abbreviation "e.g." mean "including without limitation," "include without limitation" or "includes without limitation".

CONFIDENTIAL

(f)    Words importing the singular include the plural and vice versa where the context so requires.

(g)    Except as may be expressly set forth herein, all references to time herein refer to Pacific Standard Time or Pacific Daylight Time, as applicable.

(h)    The Parties acknowledge and agree that they have mutually negotiated the terms and conditions of this Agreement and that any provision contained herein with respect to which an issue of interpretation or construction arises shall not be construed to the detriment of the drafter on the basis that such Party or its professional advisor was the drafter, but shall be construed according to the intent of the Parties as evidenced by the entire Agreement.

1.3    **Order of Precedence.** Except as otherwise expressly set forth in the body of this Agreement, in the event of a conflict, ambiguity or inconsistency between the provisions in the body of this Agreement and any Exhibit, the provisions in the body of this Agreement will prevail.

2.    TERM

2.1    **Initial Agreement Term.** The initial term of this Agreement shall commence on the Effective Date and continue until 23:59 p.m. on either the Initial Agreement Expiration Date, the last day of the final Extension Period, or such earlier date upon which this Agreement is terminated in accordance with its terms (the **"Initial Agreement Term"**).

2.2    **Renewal and Extension.** At least six (6) months prior to the Initial Agreement Expiration Date, Supplier will provide to Gateway the terms, conditions and pricing that Supplier proposes would apply to any renewal term of this Agreement. If Gateway desires to renew this Agreement, but the Parties are unable to agree on the terms, conditions and pricing for a renewal term at least ninety (90) calendar days before the Initial Agreement Expiration Date, Gateway may unilaterally elect to extend the Initial Agreement Term for a period of twelve (12) months (an **"Extension Period"**) from the Initial Agreement Expiration Date. The terms, conditions and pricing in effect as of the Initial Agreement Expiration Date will apply to the Extension Period, except that the ECA Adjustment will apply to pricing during the Extension Period. If the Parties are unable to reach agreement on the terms, conditions and pricing applicable to the renewal of this Agreement at least thirty (30) calendar days before the end of the initial Extension Period, Gateway may elect to either (i) allow this Agreement to expire at the end of such Extension Period, or (ii) extend the Initial Agreement Term for up to two (2) additional Extension Periods of twelve (12) months each; provided that Gateway notifies Supplier of Gateway's election to extend the Initial Agreement Term at least thirty (30) calendar days before the end of the then-current Extension Period, and provided further that the ECA Adjustment will continue to apply to pricing during the Extension Periods described in clause (ii) above.

3.    SERVICES

3.1    **Base Services Defined.** Base Services means the services, functions and responsibilities of Supplier, as they may evolve during the Term and as they may be

2

CONFIDENTIAL

supplemented, enhanced, modified or replaced (e.g., to keep pace with technological advancements and improvements in the methods of delivering Services), including the following:

(a)    the services, functions, and responsibilities described in this Agreement;

(b)    the services, functions and responsibilities routinely performed prior to the Effective Date by the Affected Employees and the Affected Contractors or such other Gateway Employees and Gateway Contractors whose services, functions or responsibilities were displaced or transitioned as a result of this Agreement, even if such service, function or responsibility is not specifically described in this Agreement; provided that such service, function or responsibility is reasonably related to the Services described in this Agreement;

(c)    the services, functions, and responsibilities reflected in those categories of the Gateway Base Case assumed by Supplier, even if the service, function or responsibility is not specifically described in this Agreement; provided that such service, function or responsibility is reasonably related to the Services described in this Agreement;

(d)    the services, functions, and responsibilities that are of a nature and type that would ordinarily be performed by an organization or part of an organization performing services similar to the Services, even if not specifically described in this Agreement; provided that such service, function or responsibility is reasonably related to the Services described in this Agreement; and

(e)    any services, functions or responsibilities required for the proper performance and delivery of the Services, whether or not expressly identified or described in this Agreement; provided that such service, function or responsibility is reasonably related to the Services.

(f)    All services, functions and responsibilities described in the foregoing paragraphs, but which are not specifically described in the Agreement, will be provided to the same extent and in the same manner as if specifically described in the Agreement.

(g)    Base Services do not include those functions and responsibilities retained by Gateway.

(h)    For clarity, Base Services include technological advancements and improvements resulting from Supplier's investment (at Supplier's sole discretion) in the course of operating an efficient business, which would generally benefit Supplier's customers. Base Services would not include revolutionary advancements or improvements specifically requested by Gateway, which require investments that Supplier would not otherwise make, and which Supplier cannot immediately exploit in engagements with other customers.

3.2    **Provision of Services.**

(a)    **Cutover Dates; Transition Services.** Beginning on the Commencement Date, Supplier must provide the Transition Services as specified in the Transition Plan for each Function. The Transition Plan sets forth a number of Cutover Dates, and specifies which Base

3

CONFIDENTIAL

Services correspond to such Cutover Dates. Beginning on each Cutover Date, Supplier must provide the Base Services that correspond with such Cutover Date.

(b) **Projects.** Supplier must perform Projects for Gateway from time to time during the Term. A list of Projects that are ongoing or planned and approved as of the Effective Date, and for which Supplier must assume responsibility as of the Cutover Date applicable to such Project, is set forth on **Exhibit 8**. In addition, Supplier must perform other Projects as specified by Gateway in accordance with the Statement of Work.

(c) **Increase or Decrease in Services.** Supplier will increase or decrease the volume of the Services according to Gateway's demand for the Services in accordance with **Exhibit 4**. Any increase in the Services in accordance with such section will not be considered a New Service.

(d) **Recipients.** Supplier shall provide the Services to Gateway and the Specified Affiliates and Authorized Users in accordance with this Agreement. With respect to Supplier's obligations and license grants contained in this Agreement, the term "Gateway" shall include Gateway and the Specified Affiliates and Authorized Users.

(e) **Resources.** Except as expressly provided otherwise in this Agreement, Supplier shall provide all facilities, assets, and resources (including personnel, Equipment, and Software) necessary for delivering the Services and otherwise meeting its obligations under this Agreement.

3.3 **Improved Technology.** In providing the Services to Gateway, and in addition to the Supplier's obligations set forth in **Exhibit 2**, Supplier shall: (a) identify and make available to Gateway opportunities to implement new technologies and methodologies advantageous to Gateway's business operations and, upon Gateway's approval, implement such technologies and methodologies; (b) maintain a level of currency, knowledge and technology that (i) allows Gateway to take advantage of technological advances in order to remain competitive; (ii) is at least current with the level of technology that Supplier generally uses in providing services similar to the Services to its other customers, except that Supplier will be relieved from compliance with this clause (ii) to the extent that Supplier's failure to maintain technology currency is at the direction of Gateway; and (iii) is at least current with the level of technology generally adopted from time to time in Gateway's industries (provided that the foregoing clause does not expand Supplier's Refresh obligations specified in the Statement of Work); (c) make available to Gateway leading-edge technology for Gateway's evaluation in connection with the Services; and (d) meet with Gateway periodically, at least once during every calendar quarter (and more often if appropriate due to changes or improvements in the business process or information technology outsourcing industry or any technology relating to the Services), in accordance with procedures agreed upon by the Gateway Relationship Manager, to inform Gateway of any new information processing technology Supplier is developing or trends and directions of which Supplier is otherwise aware that could reasonably be expected to have an impact on Gateway or Gateway's business.

3.4 **Governmental Approvals.** Gateway shall, at its own cost and expense, obtain and maintain all Governmental Approvals, and provide any notice to any Governmental

4

CONFIDENTIAL

Authority, that Gateway is required to obtain, maintain, or provide under any Gateway Law (collectively, "**Gateway Governmental Approvals**"). Supplier shall, at its own cost and expense, obtain and maintain all Governmental Approvals, and provide any notice to any Governmental Authority, that Supplier is required to obtain, maintain, or provide under any Supplier Law or Outsourcing Law (collectively, "**Supplier Governmental Approvals**"). Upon request by either Party, the other Party shall provide to the requesting Party reasonable cooperation and assistance in obtaining Governmental Approvals hereunder.

3.5     **Laws**

(a)     Gateway will be responsible for Laws applicable to Gateway and its business, other than Supplier Laws and Outsourcing Laws ("**Gateway Laws**"). Supplier will be responsible for Laws applicable to Supplier and its business ("**Supplier Laws**").

(b)     **Notice of Changes in Supplier Laws and Gateway Laws.** Gateway shall monitor and promptly identify and notify Supplier of all changes in Gateway Laws. Supplier shall monitor and promptly identify and notify Gateway of all changes in Supplier Laws, together with any changes in Laws applicable to either Party as a result of the provision or receipt of the Services ("**Outsourcing Laws**").

(c)     **Effect of Changes in Laws.**

(i)     **Gateway Laws.** Supplier and Gateway shall work together to identify the effect of changes in Laws on the provision or receipt of the Services. With respect to changes in Gateway Laws, the Parties shall discuss modifications to the Services, if any, necessary to comply with such changes. Supplier shall promptly thereafter propose any adjustment to the applicable Fees associated with such modifications. Upon Gateway's consent, Supplier shall implement such modifications to the Services in a timely manner. If any Gateway Law, or any change in the Services required to conform to a Gateway Law, results in a substantial fee increase or adversely affect Supplier's performance of the Services, Gateway may terminate the affected portion of the Services (or all, if applicable) as of the date specified by Gateway in its notice of termination without payment of any Termination Fees. Gateway shall pay Wind-Down Costs, if any, associated with the portion of the Services terminated by Gateway in accordance with this Section 3.5(c)(i).

(ii)     **Supplier Laws.** With respect to changes in Supplier Laws, Supplier shall implement in a timely manner, at its own cost and expense, any changes in the Services required to comply with such changes; provided, that if such changes have a material effect on the provision or receipt of the Services, Supplier shall obtain Gateway's consent before implementing such changes.

(iii)     **Outsourcing Laws.** With respect to the introduction of new Outsourcing Laws, or changes in Outsourcing Laws, Supplier shall implement any changes in the Services required to comply with such introduction or changes in a timely manner; provided, that if such introduction or changes have a material effect on the provision or receipt of the Services, Supplier shall obtain Gateway's consent prior to implementing such changes. If an introduction or change in an Outsourcing Law, or a change in the Services required to conform

5

CONFIDENTIAL

to an Outsourcing Law and/or an Outsourcing Tax imposed after the Effective Date, results in an incremental increase in the cost of providing or receiving the Services by five percent (5%) or less of the then-current Base Charges, and ten percent (10%) or less, on a cumulative basis, of the Base Charges for the first Contract Year, the Parties will negotiate appropriate equitable adjustments to the Fees, Resource Baselines or the Service Levels. If the Parties are unable to agree on such adjustments, Gateway may terminate the affected portion of the Services (or all, if applicable) as of the date specified by Gateway in its notice of termination without payment of any Termination Fees. Gateway shall pay Wind-Down Costs, if any, associated with the portion of the Services terminated by Gateway in accordance with this Section 3.5(c)(iii).

                    **(iv)**    **Reduction in Services.** If any change in Law, or change in the Services required to conform to a change in Law, results in a reduction (whether temporary or permanent) in the Services or in the level or quality of the Services, then Gateway may elect either (i) to negotiate and implement an equitable reduction to the applicable Fees, or (ii) to terminate the affected portion of the Services as of the date specified by Gateway in its notice of termination without payment of any Termination Fees. Gateway shall pay Wind-Down Costs, if any, associated with the portion of the Services terminated by Gateway in accordance with this Section 3.5(c)(iv) as a result of a Gateway Law.

      **3.6**    **Existing Technology; Architecture and Standards.** Supplier shall (a) support all of the technologies identified in this Agreement or employed by Gateway as of the Effective Date, including those technologies specified on **Exhibit 17**, and (b) comply with Gateway's information management technical architecture and product standards as the same may be modified by Gateway from time to time and communicated to Supplier.

      **3.7**    **Knowledge Sharing.** At least once every Contract Year, and upon Gateway's request, Supplier shall meet with representatives of Gateway in order to (a) explain how the Systems work and are operated, (b) explain how the Services are provided, and (c) provide such reasonable training and documentation that Gateway may reasonably require for designated Gateway Employees and Agents of Gateway to understand and operate the Systems and provide the Services or services similar to the Services after the expiration or termination of this Agreement.

      **3.8**    **Insourcing; Right to Use Third Parties.** Subject to Section 18.6, and upon at least thirty (30) days' notice, Gateway may perform itself, contract with one or more third parties to perform, or otherwise remove from the scope of Base Services (in any such case, **"Resourcing"**) all or any portion of the Services then being provided by Supplier.

      **3.9**    **Reports.** Supplier shall provide to Gateway, in a form acceptable to Gateway, the reports set forth in **Exhibit 12**, any other reports identified in this Agreement, modifications to such reports as requested by Gateway, and any reports Gateway requests from time to time, to the extent that they can be provided using resources within the then-current Resource Baselines.

420079 v9/HN
904v09!.DOC

CONFIDENTIAL

**3.10    Procurement.** If Gateway requests that Supplier obtain on Gateway's behalf any New Equipment or services outside of the Base Services, Supplier shall (a) identify the most favorable terms available to Supplier for any New Equipment and (b) upon Gateway's request, acquire the New Equipment or services (or secure the new services) on Gateway's behalf. Supplier will leverage any discounts or other favorable purchasing arrangements it may enjoy through its relationships with third parties. Supplier shall, upon Gateway's request, (i) purchase the New Equipment (or secure the new services) on behalf of Gateway, (ii) lease, or arrange for a third party to lease such New Equipment to Gateway or (iii) license, or arrange for a third party to license such New Equipment to Gateway. Gateway shall pay to Supplier, the supplier, third-party lessor or third-party licensor, as applicable, the purchase, lease or license fees, as applicable, for the New Equipment or new services. Except as otherwise agreed by the Parties or as otherwise provided in this Agreement (1) all rights in and title to any New Equipment purchased by Supplier on behalf of Gateway and paid for by Gateway shall belong to Gateway and (2) all New Equipment shall be new.  All third-party warranties with respect to New Equipment and such new services shall run to and be for the express benefit of Gateway.

**3.11    Upgrades and Refresh.** Supplier shall upgrade Software and refresh Equipment in accordance with **Exhibit 4**.

**3.12    Asset Transfer.** On the Effective Date, Supplier will purchase the Assets (as such Assets are specified in Attachment 1 of **Exhibit 22**) for the total consideration of $3,500,000, which amount shall be credited against Fees, beginning with the first invoice. Supplier will be responsible for and will pay all sales, use and other similar taxes arising out of or in connection with the transfer of the Assets by GCI to Supplier.  On the Effective Date, GCI will assign and transfer to Supplier good and valid title in and to the Assets free and clear of all liens, except permitted liens, by delivery of one or more general assignments and bills of sale in the form of **Exhibit 22**, duly executed by GCI and Supplier.

(a)    Notwithstanding anything to the contrary in this <u>Section 6</u>, during the period beginning on the Effective Date and ending on the date on which the final Asset is removed from a Gateway Service Location (in accordance with the Transition Plan) for the Data Center Services, Supplier shall control access to those portions of the Gateway Service Locations in which the Assets are located.  Except in emergency situations (as reasonably determined by Gateway), Gateway and the Gateway Agents may not enter such portions of the Gateway Service Locations during such period without the prior consent of Supplier.

**4.    TRANSITION; ACQUISITIONS AND DIVESTITURES; COOPERATION**

**4.1    Transition Services.**  Supplier shall perform all services, functions, and responsibilities necessary to accomplish the transition of Gateway's operations and capabilities to Supplier (the "**Transition Services**").  Supplier shall perform the Transition Services in accordance with the Transition Plan and without causing a material disruption to Gateway's business. Supplier shall designate an individual who shall be responsible for managing and implementing the Transition Services (the "**Supplier Transition Manager**"), as well as individuals for each of Gateway's facilities and functions affected by the transition who shall be responsible for managing and implementing the Transition Services specific to such facilities and functions. Until the completion of the applicable Transition Services, the Supplier Transition

7

CONFIDENTIAL

Manager shall review with the Gateway Relationship Manager the status of the Transition Services as often as may be reasonably requested by the Gateway Relationship Manager.

**4.2    Transition Milestones**. The Transition Plan includes a list of milestones (including Critical Deliverables) relating to Supplier's obligations under the Transition Plan. If Supplier fails to achieve any milestone by the completion date specified for such milestone in the Transition Plan, Gateway shall not be required to pay any portion of any Fees associated with such milestone unless and until the specified milestone is completed. If Supplier fails to achieve any Critical Transition Milestone by the completion date specified for such milestone in the Transition Plan, Gateway may elect to terminate this Agreement as of the date specified by Gateway in its notice of termination without payment of any Termination Fee or other liability; provided, that Gateway may not terminate this Agreement for breach due to the failure to meet the completion date in the Transition Plan in the following circumstances: (1) if such Critical Transition Milestone is identified in the Transition Plan as curable, and Supplier cures such breach within the period specified in the Transition Plan; or (2) if the failure to achieve the Critical Transition Milestone is not directly caused by Supplier.

**4.3    Acquisitions, New Specified Affiliates, and Divestitures**

(a)    **New Entities**. With respect to Gateway's acquisition of other entities, or Gateway's inclusion of additional Specified Affiliates (collectively, **"New Entities"**), Supplier shall, as requested by Gateway, provide support services as necessary to incorporate the New Entities' systems into the Systems. Such support services shall include assessments, transition planning, migration and those services specified in **Exhibit 2**. Supplier shall also provide all or a portion of the Services as specified by Gateway, to the New Entities in accordance with this Agreement.

(b)    **Divestitures**. If Gateway divests itself of a business unit or entity, or removes a Specified Affiliate (collectively, **"Divested Entities"**), Supplier shall continue to provide, at Gateway's request, the Services to the Divested Entity for up to twelve (12) months under the then-current terms, conditions and pricing of this Agreement. In addition, with respect to any such divestitures, Supplier shall provide support services to Gateway, the Divested Entity, and the acquiring entity as necessary to transfer the Divested Entities' systems to a third party or enable such entity to provide such services to itself, including those services specified in **Exhibit 2**. At the time of any divestiture, the Parties will address and resolve, to the Parties' mutual satisfaction, any good faith, reasonable concerns that Supplier may have as to the creditworthiness of such Divested Entity.

(c)    **Additional Costs**. Gateway shall pay any direct or allocable (in the case of applicable enterprise-wide agreements), verifiable costs charged by third parties to Supplier as a result of Supplier's provision of the Services described in Section 4.3(a) or Section 4.3(b), such as costs for additional Consents or additional licenses or leases required in connection with such Services; provided that Supplier obtains Gateway's prior approval for the type and amount of such costs.

(d)    Services provided to New Entities or Divested Entities will be considered part of the Base Services, to the extent that they can be provided within the then-current

8

CONFIDENTIAL

Resource Baseline. Usage above the then-current Resource Baseline will be addressed in accordance with **Exhibit 4**.

(e) **Consolidation Services.** Upon Gateway's request, Supplier will assist and support Gateway activities in connection with the closing of any Gateway facilities, services or systems and disposal of any Gateway assets in connection with the functions and services being transitioned to Supplier in accordance with this Agreement. These consolidation services will be considered part of the Base Services, to the extent that they can be provided within the then-current Resource Baselines.

4.4 **Cooperation with Third Parties.** Gateway may from time to time hire subcontractors, consultants, or other third parties ("**Gateway Third-Party Contractors**") to perform services or provide products to Gateway. Supplier shall cooperate with and work in good faith with any Gateway Third-Party Contractors as requested by Gateway, including by providing the following:

(a) in writing, to the extent available, applicable requirements, standards and policies applicable to the Services so that the goods and services provided by the Gateway Third-Party Contractor may work in conjunction with or be integrated with the Services;

(b) in writing, the applicable requirements of any required interfaces for the Gateway Third-Party Contractor's work product;

(c) in writing, information regarding the operating environment, system constraints and other operating parameters and the applicable requirements of any necessary modifications to the Systems;

(d) Supplier's quality assurance, and its development and performance acceptance testing, for the Gateway Third-Party Contractor's work product;

(e) assistance and support services to Gateway, the Gateway Third-Party Contractor or any other third party, including Supplier's participation as required to permit Supplier, Gateway, Gateway Third-Party Contractors or any other third party to acquire the knowledge necessary to efficiently operate and maintain the Gateway Third-Party Contractor's work product as part of the Systems; and

(f) access to the Software, Equipment and facilities used to provide the Services, to the extent that such access is required for the services provided by the Gateway Third-Party Contractor, and, with respect to Equipment and Software, to the extent that such access is permitted under any underlying agreements with Supplier's third-party licensors.

(g) Before receiving Supplier Confidential Information under this provision, Gateway Third-Party Contractors will execute an appropriate non-disclosure agreement, or is otherwise subject to written confidentiality obligations substantially similar to **Exhibit 25**.

5. **NEW SERVICES**

420079 v9/HN
904v09!.DOC

CONFIDENTIAL

5.1    **New Services.** Gateway may from time to time during the Term and the Termination Assistance Period request that Supplier perform a New Service. Within ten (10) calendar days after receipt of such a request from Gateway (or such other time as Gateway and Supplier may agree), Supplier shall provide Gateway with a written proposal for such New Service which shall be in the form set forth in **Exhibit 23** (a "**New Service Proposal**"). Supplier shall not include in any New Service Proposal any terms and conditions not set forth in the form on **Exhibit 23**. Supplier shall not begin performing any New Service until Gateway and Supplier have agreed upon the terms for such New Service and the Gateway Relationship Manager has provided Supplier with written authorization by executing the New Service Proposal to perform the New Service. Any New Service performed by Supplier without such advance agreement to terms and authorization shall be deemed part of the Base Services without incremental charge, until such time as Gateway authorizes such New Service, at which time Supplier will invoice, and Gateway will pay, for such New Service.

5.2    **Fees for New Services.** Supplier's charges and fees specified in any New Service Proposal shall be no more than the charges and fees for such services that Supplier provides to domestic customers similar to Gateway that are acquiring services of similar type over a similar term, at similar levels and in similar volumes. The charges and fees for such New Service shall take into account resources and expenses of Supplier for then-existing Services that would no longer be required if the New Service were performed by Supplier, as well as synergies and efficiencies that are available in light of existing Services.

5.3    **Third-Party Services.** If Gateway performs itself, or contracts with a third party to perform, any New Service, Supplier shall cooperate in good faith with Gateway and any such third party with respect to the provision or receipt of such service, in accordance with Section 4.4.

6.    **GATEWAY RESPONSIBILITIES.**

6.1    **Gateway Relationship Manager.** Gateway shall appoint an individual (the "**Gateway Relationship Manager**") who from the Effective Date of this Agreement shall serve as the primary Gateway representative under this Agreement. The Gateway Relationship Manager shall (a) have overall responsibility for managing and coordinating the performance of Gateway's obligations under this Agreement and (b) be authorized to act for and on behalf of Gateway with respect to all matters relating to this Agreement. Notwithstanding the foregoing, the Gateway Relationship Manager may, upon notice to Supplier, delegate such of his or her responsibilities to other Gateway Employees, as the Gateway Relationship Manager deems appropriate.

6.2    **Gateway Resources.**

(a)    **Facilities.** Beginning on the Commencement Date (with respect to that portion of the Services that Supplier shall begin providing on such date, as specified in the Transition Plan) and continuing only as long as Supplier requires the same for the performance of the Services, Gateway shall provide to Supplier, at no charge to Supplier and subject to this Section 6, the use of the space in the Gateway Service Locations required for Supplier to perform such portion of the Services (as such space is identified in **Exhibit 7**), together with reasonable

10

CONFIDENTIAL

office furnishings, janitorial services, security services, land-line telephones (excluding international and long-distance charges), parking, access to servers, printers (excluding paper and toner cartridges), and utilities, in each case to the same extent that Gateway otherwise provides such supplies and services to subcontractors performing similar work for Gateway at such facilities. For clarity, Gateway shall not provide personal productivity tools to Supplier, including computers, local printers, Blackberry-type devices, cell phones or similar items. The Gateway Service Locations are made available to Supplier on an "as-is, where-is" basis.

(b)    **Systems**. If Gateway grants Supplier access to any Gateway systems, such access shall be solely for purposes of performing the Services, and Supplier's access shall be limited to those specific systems identified in this Agreement and the time periods and personnel designated by Supplier and agreed to by Gateway and Supplier. Supplier's access shall be subject to such business control and information protection policies, standards, and guidelines as may be provided to Supplier by Gateway from time to time. Any other use by Supplier of any other Gateway assets or property or systems is prohibited.

6.3    **Use of Gateway Facilities**. Supplier shall use the Gateway Service Locations for the sole and exclusive purpose of providing the Services. Use of such facilities by Supplier does not constitute a leasehold interest in favor of Supplier or any of Supplier's customers.

(a)    Supplier shall comply with the requirements related to Gateway Facilities contained in this Section 6 and **Exhibit 2**.

(b)    Supplier and Supplier Agents shall use the Gateway Service Locations in an efficient manner. To the extent that Supplier operates the space in a manner that unnecessarily increases facility costs incurred by Gateway, Gateway reserves the right to set-off the excess costs of such practices from the Fees payable to Supplier under this Agreement.

(c)    Supplier and Supplier Agents shall keep the Gateway Service Locations in good order, not commit or permit waste or damage to such facilities, not use such facilities for any unlawful purpose or act and comply with all of Gateway's standard and site-specific policies and procedures as in effect from time to time, including procedures for the physical security of the Gateway Service Locations, as communicated to Supplier. Supplier will be responsible for damages to and penalties or fines levied on the Gateway Service Locations that are caused by Supplier, Supplier Agents, or their respective employees or invitees.

(d)    Subject to Section 6.2(c), Supplier shall permit Gateway and Gateway Agents to enter into those portions of the Gateway Service Locations occupied by Supplier's staff at any time.

(e)    Supplier shall not make any improvements or changes involving structural, mechanical or electrical alterations to the Gateway Service Locations without Gateway's approval. Any such improvements or changes will be at Supplier's expense and will become the property of Gateway or its lessors.

CONFIDENTIAL

(f)    When the Gateway Service Locations are no longer required for performance of the Services, Supplier shall return such locations to Gateway in substantially the same condition as when Supplier began using such locations, subject to ordinary wear and tear.

7.    ADMINISTRATION OF ASSIGNED AGREEMENTS AND MANAGED AGREEMENTS

7.1    **Managed Agreements**. Supplier shall manage, administer, maintain and comply with all terms of the Managed Agreements. Supplier shall provide Gateway with reasonable notice of any renewal, termination or cancellation dates and fees with respect to the Managed Agreements. Supplier shall not renew, modify, terminate or cancel, or request or grant any consents or waivers under, any Managed Agreements without the prior consent of the Gateway Relationship Manager. Any fees or charges or other liability or obligation imposed upon Gateway in connection with (a) any renewal, modification, termination, or cancellation of, or consent or waiver under, the Managed Agreements, obtained or given without Gateway's consent as required under the foregoing sentence, or (b) Supplier's failure to comply with the terms of the Managed Agreements, shall be paid or discharged, as applicable, by Supplier. If required for Supplier to obtain the applicable Consents, Supplier shall agree to be bound by the terms of the Managed Agreements.

7.2    **Managed Agreement Invoices**. Supplier shall (a) receive all Managed Agreement Invoices, (b) review and correct any errors in any such Managed Agreement Invoices in a timely manner, and (c) submit such Managed Agreement Invoices to Gateway within a reasonable period of time prior to the due date, but no later than the earlier of the following: (i) ten (10) calendar days after receipt of such Managed Agreement Invoice, (ii) fifteen (15) calendar days prior to the due date (or, if Supplier receives the Managed Agreement Invoice fewer than fifteen (15) calendar days prior to the due date, within three (3) calendar days), or (iii) if a discount for payment is offered, at least five (5) calendar days before the date on which Gateway may pay such Managed Agreement Invoice with a discount (or, if Supplier receives the Managed Agreement Invoice fewer than five (5) calendar days prior to such date, within three (3) calendar days). Provided that Supplier submits the Managed Agreement Invoice to Gateway on a timely basis (as described above), Gateway shall pay the Managed Agreement Invoices received and approved by Supplier. Gateway shall only be responsible for payment of the Managed Agreement Invoices and shall not be responsible to Supplier for any management, administration or maintenance fees of Supplier in connection with the Managed Agreement Invoices. Gateway shall be responsible for any late fees with respect to the Managed Agreement Invoices, provided that Supplier submitted the applicable Managed Agreement Invoices to Gateway for payment on a timely basis (as set forth above). If Supplier fails to submit a Managed Agreement Invoice to Gateway for payment in accordance with this section (including the time periods set forth above), Supplier shall be responsible for any discount not received and any late fees, interest or penalties with respect thereto.

7.3    **Assigned Agreements**. Supplier shall assume all financial, operational and other responsibility (including all obligations and post-assignment liability) for the Assigned Agreements. Supplier may, to the extent permitted by the Assigned Agreements, renew, modify, terminate or cancel, or request or grant any consents or waivers under, any such Assigned Agreements. Supplier shall agree to be bound by and comply with the terms of the Assigned Agreements. Any modification, termination or cancellation fees or charges imposed upon

12

CONFIDENTIAL

Gateway in connection with any modification, termination or cancellation of, or consent or waiver under, the Assigned Agreements shall be paid by Supplier. Except as otherwise specified in **Exhibit 4**, if Gateway prepaid any amounts under any Assigned Agreements which apply to expenses incurred after the Effective Date, then Supplier shall reimburse or credit Gateway for such amounts on the next invoice delivered by Supplier for the Services. If Supplier fails to reimburse or credit Gateway for such amounts on the next invoice, Gateway shall be entitled to set off the prepaid amounts from Fees payable under such invoice or future invoices received from Supplier.

     **7.4    Assigned Agreement Invoices.** Without limiting <u>Section 7.3</u>, Supplier shall pay the invoices submitted by third parties in connection with the Assigned Agreements (but will have financial responsibility only with respect to amounts incurred after the Effective Date) and shall be responsible for any late fees with respect to such third-party invoices.

     **7.5    Performance Under Agreements.** Supplier shall promptly notify Gateway of any breach of, or misuse or fraud in connection with, any Gateway Third-Party Contracts of which Supplier becomes aware, or should reasonably be aware, and shall cooperate with Gateway to prevent or stay any such breach, misuse or fraud. Supplier shall pay all amounts due for any penalties or charges (including amounts due to a third party as a result of Supplier's failure to promptly notify Gateway pursuant to the preceding sentence), associated taxes, legal expenses and other incidental expenses incurred by Gateway as a result of Supplier's non-performance of its obligations under this Agreement with respect to the Gateway Third-Party Contracts, except to the extent caused by an act or omission of Gateway.

**8.    SERVICE LEVELS.**

     **8.1    Service Levels.** Beginning on each Cutover Date, Supplier shall perform the Base Services associated with such Cutover Date in accordance with **Exhibit 3**. Supplier shall perform all Services that do not have defined Service Levels in a manner consistent with best practices in the information technology and applicable business process outsourcing industry and at service levels that equal or exceed the level of service being provided by Gateway prior to the Cutover Date applicable to such service.

     **8.2    Review of Service Levels.** In addition to the Service Level adjustments specified in **Exhibit 3**, the Executive Steering Committee shall review the Service Levels for the preceding twelve (12) months during the last calendar quarter of every Contract Year, and, with respect to any Service Levels that are no longer appropriate because of an increase, decrease or change to the Services, or for any other reason, shall adjust such Service Levels for the subsequent Contract Year. In addition, either Party may, at any time upon notice to the other Party, initiate negotiations to review and, upon agreement by the Executive Steering Committee, adjust any Service Level that such Party in good faith believes is inappropriate at the time.

     **8.3    Root-Cause Analysis.** With respect to each failure by Supplier to provide the Services in accordance with a Critical Service Level, Supplier shall, as soon as reasonably practicable but not later than ten (10) calendar days after such failure, (a) perform a root-cause analysis to identify the cause of such failure, (b) provide Gateway with a report detailing the cause of, and procedure for correcting, such failure, (c) upon Gateway's approval of such

13

CONFIDENTIAL

corrective procedure, implement such procedure, and (d) provide Gateway with assurance satisfactory to Gateway that such failure shall not recur following the completion of the implementation of the procedure. If Supplier, using it best efforts, cannot complete its obligations under clauses (a) through (d) above within the ten (10)-day period, Supplier shall, on a regular basis until such obligations are completed, review with Gateway Supplier's progress in completing such obligations (and provide written summaries thereof and a schedule for completion). Supplier shall address and resolve any concerns raised by Gateway in connection with such reviews. The root-cause analysis described in this Section 8.3 is in addition to other obligations of Supplier and to other remedies available to Gateway under this Agreement, at law or in equity.

**8.4    Measurement and Monitoring Tools.** As of the Cutover Date applicable to a portion of the Services, Supplier shall implement and operate all measurement and monitoring Tools and procedures required to measure and report Supplier's performance of such portion of the Services against the applicable Service Levels. Such measurement and monitoring Tools and procedures shall (a) permit reporting at a level of detail sufficient to verify compliance with the Service Levels and (b) be subject to audit by Gateway or its designee. A list of approved measurement and monitoring Tools that Supplier shall use to measure Supplier's performance as of each applicable Cutover Date is set forth in **Exhibit 3**. Supplier shall provide Gateway and its designees with information and access to such measurement and monitoring Tools and procedures upon request, for inspection and verification purposes. Supplier shall ensure that the Systems used by Supplier to support the Services shall be interoperable with the Software and Equipment used by Gateway which may deliver records to, receive records from, or otherwise interact with such Systems.

**8.5    Continuous Improvement and Best Practices.** In addition to Supplier's obligation in Section 3.3 and **Exhibit 3**, Supplier shall on a continuous basis, (a) to the extent possible, identify opportunities to implement new technologies that shall improve the Services and the Service Levels or reduce cost, and (b) identify and apply proven techniques and tools from other installations within its operations that would benefit Gateway. Supplier shall, from time to time, include updates with respect to such improvements, techniques and tools in the reports provided to Gateway pursuant to Section 3.9.

**8.6    Service Level Credits.** If Supplier fails to provide the Services in accordance with the applicable Service Levels, Supplier will incur the Service Level Credits identified in and according to **Exhibit 3**. The Service Level Credits will not limit Gateway's right to recover, in accordance with this Agreement, other damages incurred by Gateway as a result of such failure.

**9.    CUSTOMER SATISFACTION AND BENCHMARKING.**

**9.1    Customer Satisfaction Surveys.** Within ninety (90) calendar days after the Effective Date, Supplier shall submit to Gateway, for Gateway's approval, (i) the identity of a third party unaffiliated with Supplier that shall conduct customer satisfaction surveys in accordance with **Exhibit 13**, and (ii) the process for conducting such customer satisfaction surveys. That third party shall complete an initial baseline customer satisfaction survey by the date specified in the Policies and Procedures Manual, the content of which Supplier shall submit to Gateway for review and approval before such survey is conducted. Gateway may elect to

14

CONFIDENTIAL

include the results of any initial customer satisfaction surveys as a baseline for measurement of the performance improvements described in **Exhibit 3**. Additional customer satisfaction surveys will be performed each January (or other time agreed by the Parties) in accordance with **Exhibit 13** by either the Supplier or by an approved third party, at Gateway's option. Supplier agrees that (i) increases in measured customer satisfaction shall be a key performance incentive for the compensation of the Key Supplier Personnel and, as appropriate, Supplier Staff, and (ii) Gateway may elect to include customer satisfaction as a measured Service Level in **Exhibit 3**. Supplier shall be responsible for all costs associated with conducting its customer satisfaction surveys.

9.2     **Disputes.**    In the event that Gateway disputes the results of a customer satisfaction survey, or in the event of a Service Level failure, Gateway may engage a third party unaffiliated with Gateway mutually agreed by the parties to conduct another customer satisfaction survey in accordance with this **Section 9**, and the results of such survey shall be binding on the Parties. Gateway will bear the costs of such third-party survey, except that Supplier will bear the costs for any such third-party survey that is requested by Gateway because of a Service Level failure. Any such third-party surveyor shall agree to a non-disclosure agreement substantially in the form attached hereto as **Exhibit 25**.

9.3     **Benchmarking Overview.** The Benchmarking Process shall be conducted by a Benchmarker chosen by Gateway from the list of Benchmarkers specified on **Exhibit 26**, or as otherwise agreed by the Parties, and Gateway shall pay the fees charged by the Benchmarker to conduct the Benchmark Process. If the Benchmarker is no longer providing the services required to conduct the Benchmarking Process at the time Gateway elects to conduct the Benchmarking Process, or if Gateway and Supplier agree that an alternative Benchmarker should be used, the Parties shall promptly designate a replacement Benchmarker. If the Parties do not agree within fifteen (15) business days on a replacement Benchmarker, Gateway shall designate the Benchmarker in its sole discretion (provided, that such Benchmarker will not be a competitor of Supplier in the applicable information technology and business process outsourcing industry). Supplier shall at its expense cooperate with and assist the Benchmarker and any other third parties involved in the Benchmarking Process, including providing data relating to the provision of the Services, as requested by Gateway or the Benchmarker.

9.4     **Benchmarking Process.** The Benchmarker shall conduct the Benchmarking Process at a time and with regard to the portion of the Services specified by Gateway in its sole discretion; provided that the Benchmarking Process (a) may not be commenced by the Benchmarker prior to the first anniversary of the Cutover Date (the Parties shall, however, begin the process of determining the Benchmarking Process when specified by Gateway) and (b) must be performed on a Tower basis, in the case of the Human Resources and Finance and Administration Functions, and in the case of the IT Function, the Benchmarking Process must be performed on at least one of the following Tower groupings: (i) End-User Services; (ii) Data Center Services; or (iii) ADM Services.

9.5     **Adjustments.**

(a)     **Service Levels.**    If any Service Levels are lower than the applicable service levels contained in the Benchmark Results, Supplier shall immediately, at Gateway's option, either increase the Service Levels to match the applicable service levels contained in the

15

CONFIDENTIAL

Benchmark Results, or reduce its Fees proportionately to adjust for the difference between the Service Levels and the applicable service levels contained in the Benchmark Results.

(b)    **Fees.** Supplier will demonstrate that the pricing in this Agreement for the relevant Tower (with respect to the Human Resources and Finance and Administration Functions), or the relevant Tower grouping (with respect to the IT Function, and as provided in Section 9.4 above) is within the fourth quartile of applicable industry performance throughout the Term (the "**Benchmark Target Pricing**"). In no event will Supplier increase the Fees as a result of any benchmarking.

(i)    **Less than 7.5% Variance.** If the Benchmark Results show that any Fees paid by Gateway to Supplier differ by less than seven and one-half percent (7.5%) from the Benchmark Target Pricing, then no action will be taken.

(ii)    **Variance between 7.5% and 20%.** If the Benchmark Results show that any Fees paid by Gateway to Supplier are more than seven and one-half percent (7.5%), but less than twenty percent (20%) higher than the Benchmark Target Pricing, then Supplier shall reduce the Fees for the relevant Tower (for the Finance and Administration Function) or Tower grouping (for the IT Function, as set forth in Section 9.4), such that the Fees payable to Supplier on a going-forward basis are again within the fourth quartile of applicable industry performance. In the Human Resources Function, Supplier shall reduce the Fees such that the Fees payable to Supplier for the Human Resources Function is again, in the aggregate (i.e., across all Towers in the Human Resources Function, and not merely on the particular Tower that was the subject of the benchmark), and on a going-forward basis, within the fourth quartile of applicable industry performance.

(iii)    **Variance above 20%.** If the Benchmark Results show that any Fees paid by Gateway to Supplier are more than twenty percent (20%) higher than the Benchmark Target Pricing, then the Parties will enter into good faith discussions for a period of ten (10) business days (or other time period agreed by the Parties) regarding potential adjustments. If the Parties do not agree on equitable adjustments, if any, during such period, Gateway may elect to terminate the portion of the Services subject to the disagreement as of the date specified by Gateway in its notice of termination without payment of any Termination Fees or any Wind-Down Costs, provided that Gateway notifies Supplier of its intent to terminate such portion of the Services within ninety (90) calendar days after the end of such ten (10)-day period. Gateway shall reimburse Supplier for unamortized investments previously agreed to by the Parties and actually made by Supplier at Gateway's direction, that are associated with the portion of the Services terminated by Gateway in accordance with this Section 9.5.

10.    **SERVICE LOCATIONS.**

10.1    **Service Locations.** The Services shall be provided to Gateway from (a) the Gateway Service Locations, (b) the Supplier Service Locations, (c) any other location for which Supplier has received Gateway's prior approval, to be given in Gateway's sole discretion, and (d) any additional Service Location as Gateway may request during the Term and Termination Assistance Period. Supplier and Supplier Agents may not provide or market services to a third

CONFIDENTIAL

party or to itself from a Gateway Service Location without Gateway's prior consent, to be given in Gateway's sole discretion.

**10.2    New Service Locations.**

(a)    **Initiated by Gateway.** Gateway will inform Supplier of any change to, or relocation of, Gateway Service Locations that Gateway is contemplating or has made a final determination to make, to the extent such change or relocation could reasonably be expected to affect Supplier's performance of the Services, so that Supplier will have a reasonable amount of time to prepare for and implement such change or relocation. Any such relocation will be considered within the scope of the Services (and subject, as applicable, to Section 3.2(c)) provided that Gateway provides Supplier with space in a comparable facility that is in reasonably close proximity to the original facility. Gateway will reimburse Supplier for substantiated one-time costs reasonably incurred by Supplier as a direct result of a relocation imposed solely by Gateway.

(b)    **Supplier Request.** If Supplier requests Gateway's approval to provide Services from a location other than a location described in Section 10.1(b), Supplier shall provide to Gateway a written relocation proposal that sets forth a description of the proposed new location, the reasons for the proposed relocation, how the relocation will be beneficial to Gateway in terms of price, performance and other relevant measures, as well as any other information requested by Gateway. Supplier shall specify in the relocation proposal the amount of Supplier's cost reductions resulting from the relocation that Supplier will pass-through to Gateway in the form of reduced Fees. Gateway may, in its sole discretion, approve or reject any proposal submitted by Supplier pursuant to this Section 10.2. Any incremental expenses incurred by Gateway as a result of a relocation to, or use of, any location other than the locations described in Section 10.1 shall be paid by Supplier or reimbursed to Gateway by Supplier or credited to Gateway by Supplier in one or more invoices.

**10.3    Safety and Physical Security Procedures.** Supplier shall maintain and enforce at all Service Locations safety and physical security procedures that are at least equal to the most stringent of the following: (a) industry standards for locations similar to the applicable Service Locations; (b) those procedures in effect at each Gateway Service Locations as of the Effective Date and which have been disclosed to Supplier, including the safety and security procedures set forth in **Exhibit 16**, as each may be amended from time to time; and (c) any higher standard otherwise agreed upon by the Parties. Without limiting the foregoing, Supplier shall at all times comply with the safety and security procedures applicable to the Gateway Service Locations and which have been communicated to Supplier.

**10.4    Data Security.** Supplier shall establish and maintain environmental, security, and other safeguards against the destruction, loss, alteration, and unauthorized access to Gateway Data in the possession of Supplier and during the electronic transmission, storage, and shipping thereof (the **"Data Safeguards"**). The Data Safeguards must comply with all Gateway data security policies, standards, requirements and specifications as Gateway may promulgate and convey to Supplier from time to time during the Term, and must be at least equal to the highest of the following: (a) industry standards for locations similar to the applicable Service Location, (b) those data security policies in effect as of the Effective Date at each Gateway Service

17

CONFIDENTIAL

Location (as disclosed to Supplier) and Supplier Service Location, (c) the data security procedures set forth in **Exhibit 16** as they may be varied by Gateway and conveyed to Supplier from time to time during the Term, and (d) any higher standard agreed upon by Gateway and Supplier. In addition, such safeguards shall be no less rigorous than required by Law. Supplier shall, at its sole expense, revise and maintain the Data Safeguards at Gateway's request. In the event Supplier intends to implement a change to the Data Safeguards (including pursuant to Gateway's request), Supplier shall notify Gateway and, upon Gateway's approval, implement such change. In the event Supplier or Supplier Agents discovers or is notified of a breach or potential breach of security relating to Gateway Data, Supplier shall immediately (y) notify the Gateway Relationship Manager of such breach or potential breach and (z) (i) investigate and remediate the effects of the breach or potential breach and (ii) provide Gateway with assurance satisfactory to Gateway that such breach or potential breach shall not recur. Gateway may establish backup security for Gateway Data and maintain backup and files for such data. If any security breach requires Gateway, under applicable Law or in its business judgment, to make a disclosure to any third party, Gateway shall be solely responsible for making such disclosure, including determining the content, methods, and means of such disclosure. Supplier shall reasonably cooperate with Gateway in formulating the disclosure, but Supplier shall not make any such disclosure at its own initiative without Gateway's prior consent. Supplier will pay all costs and expenses of notification if the security breach is caused by or related to a breach of this Agreement by Supplier or Supplier Agents.

      **10.5    Protection of Gateway Data and Gateway Confidential Information.** Supplier shall develop and, subject to Gateway's prior approval, implement policies to (a) segregate all Gateway Data from that of any other client, and (b) restrict access to Gateway's Confidential Information so that Supplier's employees or Supplier Agents providing services to any Gateway Competitor do not have access to Gateway Confidential Information.

**11.**    HUMAN RESOURCES. The hiring and employment of Transitioned Personnel by Supplier shall be effected in accordance with the terms and conditions set forth in **Exhibit 5**.

**12.**    SUPPLIER STAFF.

      **12.1    Supplier Account Executive.** Supplier shall appoint an individual (the **"Supplier Account Executive"**) who from the date of this Agreement shall serve, on a full-time basis, as the primary Supplier representative under this Agreement. Supplier's appointment of any Supplier Account Executive shall be subject to Gateway's prior approval. The Supplier Account Executive shall (a) have overall responsibility for managing and coordinating the performance of Supplier's obligations under this Agreement and (b) be authorized to act for and on behalf of Supplier with respect to all matters relating to this Agreement.

      **12.2    Key Supplier Personnel.** With respect to the Key Supplier Personnel, the Parties agree as follows:

          (a)    All Key Supplier Personnel shall be dedicated to the Gateway account on a full-time basis unless otherwise specified on **Exhibit 5**.

CONFIDENTIAL

(b)     Before assigning an individual to a Key Supplier Personnel position, whether as an initial assignment or as replacement, Supplier shall (i) notify Gateway of the proposed assignment, (ii) introduce the individual to appropriate representatives of Gateway, (iii) provide Gateway with a resume and any information regarding the individual that may be reasonably requested by Gateway, and (iv) obtain Gateway's approval for such assignment.

(c)     Supplier shall not replace or reassign: (i) the Supplier Account Executive or the Supplier service delivery managers for each Function for two (2) years from the date such individual begins his or her tenure in that position; (ii) the Supplier Transition Manager until thirty (30) calendar days after the completion of all Transition Services; (iii) the Critical Affected Personnel for twenty-four (24) months after the Effective Date; (iv) any Transitioned Personnel for six (6) months; or (v) any other Key Supplier Personnel for eighteen (18) months from the date such individual begins his or her tenure in that position (and, without limiting the foregoing eighteen (18) month obligation, if any of the Key Supplier Personnel has duties in connection with a particular discrete project, until the completion of such project), unless, in each case, Gateway consents in its sole discretion to such replacement or reassignment, or such individual (1) voluntarily resigns from Supplier, (2) is dismissed by Supplier for misconduct, (3) fails to perform his or her duties and responsibilities pursuant to this Agreement, or (4) is unable to work due to disability.

(d)     If Gateway decides in good faith that any Key Supplier Personnel should not continue in his or her position, Gateway may in its sole discretion and upon notice to Supplier require the immediate removal of such Key Supplier Personnel from the Supplier Staff; provided that Supplier shall, upon request, have a reasonable time period, not to exceed five (5) calendar days, to investigate the matter and discuss such removal. At the end of such period, Gateway shall decide in its sole discretion whether to require removal of such Key Supplier Personnel. Supplier shall, as soon as reasonably practicable, replace any Key Supplier Personnel removed pursuant to this <u>Section 12.2(d)</u>. For clarity, nothing in this section requires Supplier to terminate the employment of any Supplier personnel.

(e)     Supplier shall maintain backup procedures and conduct replacement procedures for Key Supplier Personnel as necessary to assure an orderly succession for Key Supplier Personnel removed from the account for any reason. Upon Gateway's request, Supplier shall make such procedures available to Gateway.

(f)     Supplier shall make the Key Supplier Personnel available for meetings with Gateway personnel in accordance with **Exhibit 6** and otherwise upon Gateway's request.

12.3    **Supplier Staff.** Supplier shall appoint to the Supplier Staff only individuals with suitable training and skills to perform the Services. Subject to applicable Law, Supplier shall provide Gateway with a list of all Supplier personnel dedicated full-time to the Supplier Staff and their respective job titles at the end of every one hundred-eighty (180)-day period after the Effective Date. Except as otherwise approved by Gateway (in its sole discretion), those Supplier personnel located on Gateway's premises may only provide services on such premises that support Gateway's operations. Supplier shall notify Gateway as soon as possible after dismissing or reassigning any member of the Supplier Staff whose normal work location is at a Gateway Service Location. Gateway shall have the right from time to time to require Supplier to

19

CONFIDENTIAL

remove any member of the Supplier Staff from working on the Gateway account with or without cause, provided that Supplier may request to have a discussion regarding such removal, which discussion must be held within a reasonable time period, not to exceed five (5) calendar days. At the end of such period, if Gateway desires the person to be removed, Supplier shall complete such removal within twenty-four (24) hours and replace such individual as soon as practicable at no cost to Gateway. Supplier shall ensure that each member of the Supplier Staff who performs work under this Agreement is informed of Supplier's confidentiality obligations to Gateway and agrees to comply with them. Supplier shall certify that it has conducted a background check and, if applicable, a drug screen that is at least as comprehensive as Supplier's standard background check and drug screen with respect to each member of the Supplier Staff prior to such individual's assignment to the Gateway account. Supplier will fill, from its own staff, any vacancies that occur among Gateway Affected Personnel during the contract negotiation process or Transition Period.

**12.4    Subcontractors**

(a)    Supplier shall directly render all Services exclusively through its employees and independent subcontractors under its control who are authorized in accordance with this Agreement.

(b)    Except as provided in clauses (c) and (d) below, prior to subcontracting any of the Services, Supplier shall notify Gateway of the proposed subcontract and the material terms thereof, including scope, costs, termination fees and license terms (if applicable), and Supplier shall obtain Gateway's approval of such subcontract, which approval may be given in Gateway's sole discretion.

(c)    Gateway may pre-approve parties that Supplier proposes to engage as subcontractors for particular purposes ("**Approved Subcontractors**"). Approved Subcontractors at the Effective Date are set forth on **Exhibit 27**, which Exhibit will be updated to include additional subcontractors approved by Gateway during the Term in accordance with this Section.

(d)    Prior to amending, modifying or otherwise supplementing any subcontract relating to the Services (including any amendment, modification, or supplement to existing contracts with Approved Subcontractors if the amendment, modification or supplement relates to any change in the duties of such Approved Subcontractor in providing the Services), Supplier shall notify Gateway of the proposed amendment, modification, or supplement and shall obtain Gateway's prior approval thereof.

(e)    No subcontracting shall release Supplier from its responsibility for its obligations under this Agreement. Supplier's subcontractors must be bound by written provisions with respect to Service Levels, Intellectual Property Rights, audit rights, warranties, and other terms consistent with the provisions of this Agreement. Supplier shall be responsible for the work and activities of each of the Supplier Agents, including compliance with the terms of this Agreement. Supplier shall be responsible for all payments to its subcontractors. Supplier shall promptly pay for all services, materials, equipment and labor used by Supplier in providing the Services and Supplier shall keep Gateway's premises and any Gateway property on Supplier's premises free of all liens and encumbrances.

20

CONFIDENTIAL

**12.5    Conduct of Supplier Personnel.** Supplier and Supplier Agents shall (a) comply with the requests, standard rules and regulations of Gateway and Supplier, including those regarding safety and health, personal and professional conduct (including adhering to general safety practices or procedures) and (b) otherwise conduct themselves in a businesslike manner. Supplier will not disclose Gateway Confidential Information to any subcontractor until such subcontractor has executed an appropriate non-disclosure agreement (or is otherwise subject to written confidentiality obligations) substantially similar to **Exhibit 25**. Supplier shall cause the Supplier Staff to maintain and enforce the confidentiality provisions of this Agreement.

**12.6    Removal of Supplier Personnel and Supplier Agents.**

(a)    **Approved Subcontractors.**  If Gateway notifies Supplier that a particular Approved Subcontractor is not conducting himself or herself in accordance with this Section, or has breached the Agreement, or is otherwise objectionable to Gateway, the Parties will promptly meet to discuss Gateway's objections and resolve the matter within thirty (30) days.  If the Parties cannot reach a satisfactory resolution, Supplier shall, as soon as reasonably practicable, (i) remove the applicable Approved Subcontractor and (ii) replace such Approved Subcontractor with a similarly qualified alternate.

(b)    **Others.**  With respect to all other subcontractors and member of the Supplier Staff, if Gateway notifies Supplier that a particular member of the Supplier Staff is not conducting himself or herself in accordance with this Section, or has breached the Agreement, or is otherwise objectionable to Gateway, Supplier shall promptly (i) investigate the matter and take appropriate action which may include (A) removing the applicable person from the Supplier Staff and providing Gateway with prompt notice of such removal and (B) replacing the applicable person with a similarly qualified individual or (ii) take other appropriate disciplinary action to prevent a recurrence. In the event of multiple violations of this Section by a particular member of the Supplier Staff, Supplier shall promptly remove the individual from the Supplier Staff.

**12.7    Assignment to Competitors.** Supplier shall not assign any Key Supplier Personnel to the account of a Gateway Competitor without Gateway's prior consent (a) while such Key Supplier Personnel is assigned to the Gateway account and (b) for a period of one (1) year following the date that such Key Supplier Personnel ceased being a member of the Supplier Staff.

21

CONFIDENTIAL

## 13.   MANAGEMENT AND CONTROL

**13.1   Governance.**  Gateway and Supplier shall implement a governance structure as specified in **Exhibit 6** that includes the content and purpose of various governance committees, the roles and responsibilities of governance committee members, and the type, content and frequency of governance meetings.  All governance meetings will be hosted at a time and location acceptable to Gateway.  Gateway may replace or reassign its governance committee members upon notice to Supplier.  Supplier shall not replace or reassign its governance committee members unless Gateway consents to such replacement or reassignment.  Before assigning an individual to a governance committee, Supplier shall notify Gateway of the proposed assignment, introduce the individual to appropriate Gateway personnel, provide Gateway with any information regarding the individual that may be reasonably requested by Gateway, and obtain Gateway's approval for such assignment.

**13.2   Policies and Procedures Manual.**  Supplier shall provide the Policies and Procedures Manual, including the Change Control Procedures therein, to Gateway for Gateway's review and approval in accordance with the Transition Plan and **Exhibit 6**.  The Change Control Procedures shall provide, at a minimum, that:

(a)   No Change shall be implemented without Gateway's approval, except as may be necessary on a temporary basis to maintain the continuity of the Services.

(b)   With respect to all Changes, Supplier shall (i) other than those Changes made on a temporary basis to maintain the continuity of the Services, schedule Changes so as not to unreasonably interrupt Gateway's business operations, (ii) prepare and deliver to Gateway each month a rolling schedule for ongoing and planned Changes for the next ninety (90)-day period and (iii) monitor the status of Changes against the applicable schedule.

(c)   With respect to any Change made on a temporary basis to maintain the continuity of the Services, Supplier shall document and provide to Gateway notification of the Change no later than the next business day after the Change is made.

(d)   The Change Control Procedures will also specify the processes for handling any Changes during Freeze Periods (as defined below) each calendar year.  "**Freeze Period**" shall mean the period of time during which there will be limited, if any, changes to the Data Center Services or ADM Services.  Freeze Periods will, at a minimum, (i) begin no later than two (2) weeks prior to end of month during the last month of each calendar quarter for the first three (3) calendar quarters of each year during the Term and a minimum of one (1) month before the end of the fourth calendar quarter of each year; and (ii) end on the fifteenth (15th) day of the month immediately following each calendar quarter.  Upon reasonable notice to Supplier, Gateway may also specify additional Freeze Periods in its reasonable discretion in connection with its business needs. The Supplier Account Executive and the Gateway Relationship Manager shall agree upon the specific Freeze Period applicable to each calendar quarter during the Term; provided, however, that, in no event will a Freeze Period be shorter than the time period described in the preceding sentence.  During each Freeze Period, any changes to the Data Center Services or ADM Services that may have an impact on internal or external Gateway customers or on Gateway's ability to deliver products or services to its customers must be approved through

22

CONFIDENTIAL

the Change Control Procedures. Notwithstanding anything to the contrary in the preceding sentence, the Gateway Relationship Manager shall have the authority to approve changes required in the event of an emergency situation that arises due to a failure or impending failure of a critical system or application, which has been confirmed and must be accelerated beyond the normal Change Control Procedures due to time constraints.

      (e)    Supplier shall update the Change Control Procedures as necessary and shall provide such updated Change Control Procedures to Gateway for its approval.

**14.   PROPRIETARY RIGHTS**

   **14.1   Ownership of Background Technology.**

      (a)   **Gateway Background Technology.**  Gateway shall have and retain exclusive ownership of all of Gateway's Background Technology, including any Intellectual Property Rights therein.

      (b)   **Supplier Background Technology.**  Supplier shall have and retain exclusive ownership of all of Supplier's Background Technology, including any Intellectual Property Rights therein.

   **14.2   Ownership of Derivative Works.**

      (a)   **Gateway Derivative Works.**  Gateway shall have and retain exclusive ownership of all of the Gateway Derivative Works, including any Intellectual Property Rights therein, except to the extent of any Supplier Materials contained therein.

      (b)   **Supplier Derivative Works.**  Supplier shall have and retain exclusive ownership of all of the Supplier Derivative Works, including any Intellectual Property Rights therein, except to the extent of any Gateway Materials contained therein.

   **14.3   Ownership of Commissioned Materials.**  Supplier will have and retain exclusive ownership of all Processes that are related to the Human Resources and Finance and Administration Functions and that are developed as Commissioned Materials, including all Intellectual Property Rights therein ("**Supplier Commissioned Processes**"). Gateway will have and retain exclusive ownership of all Commissioned Materials other than the Supplier Commissioned Processes (including all Commissioned Materials related to the IT Function), including any Intellectual Property Rights therein ("**Gateway-Commissioned Materials**"). Supplier shall provide to Gateway all Commissioned Materials promptly after the completion thereof, including the complete source code and object code of any Software therein and any associated Documentation.  Prior to using any Commissioned Materials to provide the Services, Supplier shall identify the Commissioned Materials to Gateway in writing.  Notwithstanding Supplier's exclusive ownership of Supplier Commissioned Processes, Supplier shall not, without Gateway's prior consent, incorporate any Supplier Commissioned Processes in any Supplier product offerings, or use any Supplier Commissioned Processes to provide services, to any third party that is competitive with Gateway, for at least one (1) year after Supplier notifies Gateway that it has completed such Supplier Commissioned Process.

CONFIDENTIAL

**14.4   Ownership of Developed Materials.**   Supplier will have and retain exclusive ownership of all Developed Materials, including any Intellectual Property Rights therein.   Prior to using any Developed Materials to provide the Services, Supplier shall identify the Developed Materials to Gateway in writing and submit such Developed Materials to Gateway for Gateway's review and approval of such materials and their use.

**14.5   License Grant to Gateway.**

**(a)   During Term.**   Supplier hereby grants to Gateway, during the Term and Termination Assistance Period, a global, fully paid, royalty-free, irrevocable, non-exclusive, license to Use the Supplier Materials (including Supplier Third-Party Materials, subject to the applicable third-party agreements covering such materials, as further described in <u>Section 14.14</u>) to use, access, and receive the Services, and to create Gateway Derivative Works and Supplier Derivative Works, and to permit Authorized Users to use the Supplier Materials in connection with Gateway's receipt of the Services.

**(b)   After Term.**   Supplier hereby grants to Gateway, after the Term and Termination Assistance Period, a global, fully paid, royalty-free, perpetual, irrevocable, non-exclusive, license to Use the Supplier Materials incorporated into the Gateway Derivative Works, and to use the Supplier Materials used in providing the Services, to provide, use, access and receive Services and services similar to the Services, including to permit Authorized Users to use the Supplier Materials in connection with Gateway's receipt of the Services, or services similar to the Services.   With respect to those portions of Supplier Materials that consist of Supplier Third-Party Materials, the license granted to Gateway and the Gateway Agents hereunder is subject to the applicable third-party agreements.

**(c)   Transferability.**   The foregoing licenses are non-transferable, except that Gateway may transfer, assign, or sublicense these licenses to its Affiliates and subcontractors in accordance with the limitations set forth in this Agreement.

**14.6   License Grant to Supplier.**   Gateway hereby grants to Supplier, during the Term and Termination Assistance Period only, a global, fully paid, royalty-free, limited license to Use the Gateway Materials as necessary to provide the Services, and to create Gateway Derivative Works and Supplier Derivative Works.   Supplier may permit Supplier Agents to Use the Gateway Materials solely to provide those portions of the Services that such Supplier Agents are responsible for providing.   With respect to Gateway Third-Party Materials, the license granted to Supplier and the Supplier Agents hereunder is subject to the applicable third-party agreements.

**14.7   Systems.**   Supplier shall provide Gateway with access to the Systems during the Term and Termination Assistance Period.   Prior to using any Systems to provide the Services, Supplier shall submit components of the Systems to Gateway for Gateway's review and approval.

**14.8   Assignments.**

**(a)   By Supplier.**   Supplier hereby does, and shall cause all Supplier Agents to, irrevocably and unconditionally assign to Gateway without further consideration all right,

CONFIDENTIAL

title, and interest each may have in any Gateway Derivative Works and Commissioned Materials, and all Intellectual Property Rights therein, except for Supplier Commissioned Processes, Supplier Derivative Works and for any Supplier Background Technology contained in any of the foregoing. If any Intellectual Property Rights in Gateway Materials, including artists' rights and moral rights, cannot (as a matter of law) be assigned by Supplier or Supplier Agents to Gateway as provided above, then (a) Supplier unconditionally and irrevocably does, and shall cause all Supplier Agents to, waive the enforcement of such rights and all claims and causes of action of any kind against Gateway with respect to such rights, and (b) to the extent Supplier or Supplier Agents cannot (as a matter of law) make such waiver, Supplier unconditionally grants, and shall cause all Supplier Agents to grant, to Gateway an exclusive (without reservation), perpetual, irrevocable, worldwide, fully paid, royalty-free, transferable, assignable, license, with the right to sublicense through multiple levels of sublicensees, under any and all such rights (i) to reproduce, create derivative works of, distribute, publicly perform, publicly display, and digitally perform, and otherwise use and exploit such Gateway Materials in any medium or format, whether now known or hereafter discovered, (ii) to use, make, have made, sell, offer to sell, import, and otherwise exploit any product or service based on, embodying, incorporating, or derived from such derivative works, and (iii) to exercise any and all other present or future rights not yet known in the Gateway Materials. Supplier hereby assigns, and shall cause all Supplier Agents to assign, to Gateway any and all claims, past, present, or future, of any nature whatsoever, Supplier or Supplier Agents may have for infringement, misappropriation, or violation of any Intellectual Property Right assigned to Gateway pursuant to this Agreement.

(b)    **By Gateway.** Gateway hereby irrevocably and unconditionally assigns to Supplier without further consideration all right, title, and interest it may have in any Supplier Derivative Works, Supplier Commissioned Processes and Developed Materials, and all Intellectual Property Rights therein, except for any Gateway Background Technology or Gateway Derivative Works contained therein. If any Intellectual Property Rights in Supplier Materials, including artists' rights and moral rights, cannot (as a matter of law) be assigned by Gateway to Supplier as provided above, then (a) Gateway unconditionally and irrevocably waives the enforcement of such rights and all claims and causes of action of any kind against Supplier with respect to such rights, and (b) to the extent Gateway cannot (as a matter of law) make such waiver, Gateway unconditionally grants to Supplier an exclusive (without reservation), perpetual, irrevocable, worldwide, fully paid, royalty-free, transferable, assignable, sublicenseable license, with the right to sublicense through multiple levels of sublicensees, under any and all such rights (i) to reproduce, create derivative works of, distribute, publicly perform, publicly display, and digitally perform, and otherwise use and exploit the Supplier Materials in any medium or format, whether now known or hereafter discovered, (ii) to use, make, have made, sell, offer to sell, import, and otherwise exploit any product or service based on, embodying, incorporating, or derived from such derivative works, and (iii) to exercise any and all other present or future rights not yet known in the Supplier Materials. Gateway hereby assigns to Supplier any and all claims, past, present, or future, of any nature whatsoever, Gateway may have for infringement, misappropriation, or violation of any Intellectual Property Right assigned to Supplier pursuant to this Agreement.

14.9    **Residual Knowledge.** Nothing in this Agreement shall restrict a Party from using the generic data processing or business process ideas, concepts, or know-how developed

25

CONFIDENTIAL

by or disclosed to a Party in connection with this Agreement and inadvertently retained in the unaided memory of the receiving Party's employees (and not intentionally memorized for the purpose of later recording or use) who have rightful access to such information under the terms of this Agreement, provided that such use does not infringe or misappropriate the Intellectual Property Rights of a Party or breach its confidentiality or other obligations under this Agreement.

14.10  **No Implied Rights.**  All rights not expressly granted in this Agreement with respect to the Supplier Materials are reserved to Supplier. All rights not expressly granted in this Agreement with respect to the Gateway Materials are reserved to Gateway.

14.11  **Further Assurances.**  Each Party shall, and shall cause its Agents, to: (a) cooperate with and assist the other Parties and their designees, both during and after the Term, in perfecting, maintaining, and enforcing such Party's or its designees' rights in all right, title, and interest in any Gateway Materials or Supplier Materials (as applicable), including all Intellectual Property Rights therein, and (b) execute and deliver to the requesting Party any documents or take any other actions as may reasonably be necessary, or as such Party may reasonably request, to perfect, maintain, protect, or enforce its or its designees' rights in such materials or otherwise carry out the purpose of this Section 14.

14.12  **Web Development.**  If Supplier performs any work in connection with the development of web pages or other online content under this Agreement, Gateway shall have sole control over the appearance, design, layout, look-and-feel, branding, advertising (if any), content, and URLs of such web pages or other online content. All such web pages, and the appearance, design, layout, look-and-feel, branding, advertising (if any), and content thereof that may be furnished by Gateway shall be deemed Gateway Commissioned Materials. Supplier shall ensure that all URLs for any web pages or online content developed or hosted by Supplier shall be owned by Gateway and registered in Gateway's name. All web pages or other online content provided or developed by Supplier by or on behalf of Gateway must comply with Gateway's then-current trademark and logo policies.

14.13  **Source Code Escrow.**  As part of the Transition Plan, the Parties will agree on a list of Software programs to be deposited with a third-party escrow agent. No later than the Cutover Date, and subject to an escrow agreement substantially in the form attached hereto as **Exhibit 28**, Supplier shall deposit the source code to all such identified materials with such third-party escrow agent. Gateway will bear the fees and expenses associated with such escrow agreement.

14.14  **Supplier Third-Party Materials.**  Gateway will have the right to approve the use of any Supplier Third-Party Materials to provide the Services, prior to the use of such Supplier Third-Party Materials.

(a)  Supplier will submit such Supplier Third-Party Materials to Gateway for Gateway's review and approval, along with a description of the license terms under which such Supplier Third-Party Materials are offered. Supplier will use its best efforts to insure that license terms for Supplier Third-Party Materials include a global, perpetual, irrevocable, fully paid, royalty-free, transferable, assignable, sublicenseable right for Gateway to Use (and permit third

26

CONFIDENTIAL

parties to Use on Gateway's behalf) such Supplier Third-Party Materials after the Term and Termination Assistance Period for the same purposes as set forth in the licenses in Section 14.5 above, at no additional cost to Gateway. If Supplier is unable to obtain such rights, Supplier will provide Gateway with the specific terms under which such Supplier Third-Party Materials are proposed to be licensed, along with complete information as to the terms (including fees) that would be applicable if Gateway were to elect to obtain such rights.

(b)    If, after reviewing such information, Gateway approves the use of the Supplier Third-Party Materials to provide the Services, then Supplier may begin to use such Supplier Third-Party Materials, and Gateway will be responsible for costs that may be incurred to continue Use of such materials after the Term. If, after reviewing such information, Gateway does not approve the use of the Supplier Third-Party Materials to provide the Services, then Supplier will promptly develop alternatives and present such alternatives to Gateway for its review. Gateway will be responsible for any incremental costs related to implementation of any alternatives. All approved Supplier Third-Party Materials used to perform a portion of the Services will be set forth on **Exhibit 32** at the Cutover Date for such portion of Services, which Exhibit Supplier will update from time to time during the Term.

(c)    On Gateway's request, Supplier will provide Gateway with a list of all Supplier Third-Party Materials being used to provide the Services as of the date of such request.

## 15.    DATA

**15.1    Ownership and Use of Gateway Data.** All Gateway Data is, or shall be, and shall remain the property of Gateway. Without Gateway's approval (in its sole discretion), Gateway Data shall not be, (a) used by Supplier or Supplier Agents other than as required to provide the Services, (b) disclosed, sold, assigned, leased or otherwise provided to third parties by Supplier or Supplier Agents, (c) monitored, analyzed, individualized, anonymized, aggregated, stored, or copied by Supplier or Supplier Agents, or (d) commercially exploited in any form (including any individualized, anonymized, or aggregated form) by or on behalf of Supplier or Supplier Agents. Supplier hereby irrevocably assigns, transfers and conveys, and shall cause Supplier Agents to assign, transfer and convey, to Gateway without further consideration all of its and their right, title and interest in and to Gateway Data. Upon request by Gateway, Supplier shall execute and deliver, and shall cause Supplier Agents to execute and deliver, any financing statements or other documents that may be necessary or desirable under any Law to preserve, or enable Gateway to enforce, its rights with respect to Gateway Data.

**15.2    Correction and Reconstruction**

(a)    Supplier shall promptly correct any errors or inaccuracies in the reports described in **Exhibit 12** to be delivered to Gateway under this Agreement.

(b)    Supplier shall develop and maintain procedures for the reconstruction of lost Gateway Data, and Supplier shall, at its expense, correct any errors in, or destruction, loss or alteration of, any Gateway Data caused by Supplier or Supplier Agents. At Gateway's request, Supplier shall promptly correct any other errors in Gateway Data not caused by Supplier or Supplier Agents. Supplier must first provide Gateway with an estimate of costs for such

27