# EXHIBIT A (Continued)

CONFIDENTIAL

correction, and will not implement such correction without Gateway's prior approval to pay such additional costs.

**15.3    Provision of Data**. Upon request by Gateway for any reason and at any time during the Term and Termination Assistance Period, Supplier shall (a) promptly provide to Gateway, in the format and on the media requested by Gateway, all or any part of Gateway Data and (b) erase or destroy all or any part of Gateway Data in Supplier's possession, in each case to the extent so requested by Gateway. Supplier and Supplier Agents will use any archival tapes containing Gateway Data solely for back-up purposes or as may be required under applicable Law. Supplier shall not withhold any Gateway Data as a means of resolving any dispute.

**15.4    Data Privacy**. Supplier acknowledges the importance Gateway places on protecting the privacy of its end users and Gateway Employees and Gateway Contractors. Accordingly, Supplier shall safeguard any individually identifiable data included in Gateway Data acquired from or about Gateway's internal or external end users, including names, addresses and credit information, against unauthorized access or use. Further, Supplier shall not, without Gateway's prior consent, use, sell, license, lease or otherwise transfer such data to any third party, or export such data to any location outside of the country in which Supplier acquired such data. Supplier shall also otherwise comply with all applicable Laws regarding the handling, collection, and transfer of personal information.

16.    CONSENTS.

**16.1    Administration of Consents**. Supplier shall obtain the Consents (other than for those agreements for which Gateway retains operational and financial responsibility). Supplier will maintain and comply with all of the Consents. If Supplier is unable to acquire a Consent despite using its best efforts to do so, Supplier shall implement, at its cost and expense, and subject to Gateway's prior approval, alternative methods as necessary to provide the Services in accordance with this Agreement without such Consent.

**16.2    Cost of Consents**. The Parties will pay the cost of the Consents required in connection with the Managed Agreements and Assigned Agreements in accordance with the allocation of financial responsibility for such agreements as specified in **Exhibit 11**.

17.    CONTINUED PROVISION OF SERVICES

**17.1    Disaster Recovery Plan**. Supplier shall comply with the Business Continuity and Disaster Recovery requirements specified in **Exhibit 2** and the procedural requirements contained in **Exhibit 14** and **Exhibit 15**. Supplier shall implement and be responsible for all disaster recovery and business continuity activities therein with respect to a Tower as of the Cutover Date for such Tower. Supplier shall (a) update and test (and re-test as necessary) the operability of the DRP in accordance with **Exhibit 2**, provided that notwithstanding such schedule Supplier shall complete the initial test of and report on the Disaster Recovery Plan no later than the date specified in **Exhibit 2**; and (b) certify to Gateway at least once during every Contract Year that the DRP is fully operational. Supplier shall immediately notify Gateway of any disaster and implement the DRP upon the occurrence of a disaster. In the event of a disaster, Supplier shall not increase the Fees or charge Gateway usage or other variable fees. In the event

28

CONFIDENTIAL

of uncertainty or a dispute regarding whether an event constitutes a disaster under the Disaster Recovery Plan, Gateway will determine in its reasonable discretion whether such event constitutes a disaster.

**17.2    Force Majeure.** If and to the extent a Party's performance of any of its obligations pursuant to this Agreement is prevented, hindered or delayed by fire, flood, earthquake, elements of nature or acts of God, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, or any other similar cause beyond the reasonable control of such Party (but specifically excluding labor and union-related activities by employees and contractors of Supplier or Supplier Agents, and failures of Supplier Agents) (each, a **"Force Majeure Event"**), and such non-performance, hindrance or delay could not have been prevented by reasonable precautions undertaken by the Party claiming a Force Majeure Event, and such Party is without fault, then such Party shall be excused for such non-performance, hindrance or delay of those obligations affected by the Force Majeure Event for as long as such Force Majeure Event continues and such Party continues to use its best efforts to recommence performance whenever and to whatever extent possible without delay, including through the use of alternate sources, workaround plans and other means. The Party whose performance is prevented, hindered or delayed by a Force Majeure Event shall immediately notify the other Party of the occurrence of the Force Majeure Event and describe in reasonable detail the nature of the Force Majeure Event. The occurrence of a Force Majeure Event does not excuse, limit or otherwise affect Supplier's obligation to provide either normal recovery procedures or any other disaster recovery services described in Section 17.1.  The Supplier shall not have the right to any additional payments from Gateway as a result of any Force Majeure Event.

**17.3    Alternate Source.** If the performance of all or a portion of the Services is prevented, hindered or delayed for more than twenty-four (24) hours, Supplier will procure the affected Services from an alternate source and Supplier shall pay the costs and expenses in procuring such Services for a period of up to ninety (90) calendar days. If the performance of all or a portion of the Services is prevented, hindered or delayed for more than ninety (90) calendar days, or if Supplier fails to secure an alternate source within seventy-two (72) hours after the occurrence of a Force Majeure Event, Gateway, at its sole discretion, may (i) terminate any portion of the Agreement affected by the Force Majeure Event; or (ii) continue to operate under the Agreement, with the third-party provider substituting for Supplier with respect to the affected Service(s), in which case Supplier will abate the Base Charges; or (iii) terminate the entire Agreement without payment of any Termination Fee as of the date specified by Gateway in a notice to the Supplier.

**17.4    No Payment for Unperformed Services.** Except as provided in Section 17.3, nothing in this Section 17 shall limit Gateway's obligation to pay any Fees; provided, however, that if Supplier fails to provide the Services in accordance with this Agreement due to the occurrence of a Force Majeure Event, the Fees shall be adjusted in a manner such that Gateway is not responsible for the payment of any Fees for Services that Supplier, or any alternate source engaged by Supplier to provide Services to Gateway pursuant to this Section 17, fails to provide.

**17.5    Allocation of Resources.** Whenever a Force Majeure Event or a disaster causes Supplier to allocate limited resources between or among Supplier's customers, Gateway will be entitled to an equitable allocation of Supplier's resources. In addition, Supplier shall not redeploy

29

CONFIDENTIAL

or reassign any personnel dedicated to the Gateway account to another account in the event of a Force Majeure Event affecting the Parties or any other customer of Supplier.

18.   **PAYMENTS**

    **18.1   Fees.** Gateway shall pay the Fees as specified in **Exhibit 4** and this <u>Section 18</u>.

    **18.2   Invoices.**  Within five (5) days of the first day of each month during the Term, Supplier will provide an invoice to Gateway (or to an Affiliate as Gateway may direct), the form of which is attached hereto as <u>Attachment 4-E</u>. Each such invoice will cover Base Charges for the upcoming month, as well as adjustments for Additional Resource Charges, Reduced Resource Credits, and Service Level Credits for the preceding month. Supplier will comply with reasonable requests by Gateway to alter the form of invoice without additional cost.  The initial invoice will be provided on the first day of the month in which the Commencement Date is scheduled to occur.

    **18.3   Payment.** Gateway will pay undisputed amounts set forth in the invoice within sixty (60) days of receipt. If Gateway has not made payment within ten (10) days after such due date, Supplier reserves the right to impose Interest on unpaid amounts, calculated on a daily basis from the end of such ten (10)-day grace period until such amounts are paid.

    **18.4   Fee Disputes.**  Gateway may withhold and offset invoiced amounts that Gateway disputes in good faith.  Gateway shall notify Supplier of all such disputes in writing by the date payment under such invoice would otherwise be due.  If the amount of disputed payments withheld by Gateway pursuant to this <u>Section 18.4</u> exceeds an amount equal to one (1) month of aggregate Fees payable under this Agreement, Gateway shall pay such excess amounts to Supplier under protest.  Upon resolution of the applicable dispute in accordance with <u>Section 24.1</u>, Gateway will remit to Supplier any amounts to which Supplier is entitled in accordance with the outcome of the dispute resolution.

    **18.5   Substantial Changes in Resource Baselines.**  In the event that Gateway's use of the Base Services that constitute a Function decreases or increases more than fifty percent (50%) in the aggregate from the Resource Baselines for such Function set forth in **Exhibit 4** and such changes persist, or Gateway expects such changes to persist, for a ninety (90)-day period (each such instance, an **"Extraordinary Event"**), Gateway and Supplier shall negotiate an equitable adjustment to the Base Charges and the Resource Baselines.  Such adjustments shall be based on Supplier's costs (and related profit) that either: (a) can be eliminated if the Extraordinary Event results in a decrease in Gateway's consumption of services or (b) are unavoidably incurred by Supplier in the event an Extraordinary Event results in an increase in Gateway's consumption of the services notwithstanding Supplier's reasonable efforts to avoid and mitigate such costs.

    **18.6   Minimum Payments.**  In accordance with <u>Section 3.8</u>, and except as provided in <u>Section 18.5</u>, Gateway may Resource all or any portion of the Services then being provided by Supplier; provided, that Gateway must pay Supplier a minimum of (a) seventy percent (70%) of the aggregate combined Base Charges for Services under the Human Resources and Finance and Administration Functions (taken together) for each Contract Year, and (b) eighty percent (80%) of the aggregate Base Charges for Services under the IT Function for each Contract Year, regardless of Gateway's actual usage of the Services.  In the first Contract Year, the minimum

CONFIDENTIAL

percentage will be calculated using the Base Charges specified on **Exhibit 4**, as that exhibit exists as of the Effective Date. In subsequent Contract Years, the minimum percentage will be calculated using the Base Charges, as they may be adjusted for such Contract Year in accordance with the provisions specified in **Exhibit 4** for revising baseline resource usage and related fees.

(a)    For example, if Base Charges for the combined Human Resources and Finance and Administration Functions in year 1 were $100, the minimum payment for those combined Functions for that Contract Year would be (70%) x ($100), or $70. If Base Charges for the same combined Functions in year 3 were $95, the minimum payment for those combined Functions for that Contract Year would be (70%) x ($95), or $66.50.

(b)    In addition, if, pursuant to Section 3.8, Gateway removes from the scope of this Agreement a portion of the Services representing more than thirty-five percent (35%) of the Base Charges of a single Tower in a Contract Year, Gateway will terminate such Tower upon notice to Supplier, as of the date specified in such notice, provided that Gateway notifies Supplier of such election within ninety (90) days of the end of such Contract Year, and subject to payment by Gateway of Wind-Down Costs, as applicable, associated with the termination of such Tower, as provided in **Exhibit 4**.

18.7    **Due Diligence.**  Supplier hereby acknowledges and agrees that Gateway has delivered or made available to Supplier all information and documents Supplier has deemed necessary for Supplier to commit to its obligations under this Agreement in accordance with its terms.  Supplier shall not be relieved of any of its obligations under this Agreement, or alter, increase or add any fees or charges related to this Agreement, as a result of (a) its failure to review the foregoing information and documents or any documents referred to therein; (b) any inaccuracies, errors, or omissions contained in such information or documents or in any documents referred to therein; or (c) its failure to request any information or documents from Gateway.

18.8    **No Other Charges.** Except as expressly set forth in this Agreement, all costs and expenses relating to Supplier's performance of the Services (including all costs and expenses related to the acquisition, maintenance and enhancement of Software and Equipment, travel and lodging, document reproduction and shipping, computers and office equipment used by Supplier Staff, and telephone charges) are included in the Fees and shall not be charged to or reimbursed by Gateway.

18.9    **Periodic Adjustments.** There will be no periodic adjustments to Fees except as set forth on **Exhibit 4**.

19.    TAXES

19.1    **Taxes.**   Gateway will be responsible for and pay the amount of any Taxes levied on Gateway that are related to its business and to the receipt of the Services from Supplier. Supplier will be responsible for and pay the amount of Taxes levied on Supplier that are related to its business and to the provision of Services to Gateway.

31

CONFIDENTIAL

**19.2    Outsourcing Taxes.**  Notwithstanding the foregoing, with respect to Taxes assessed on a Party that arise from or relate to (a) the relocation or rerouting of the delivery of Services to or through a location outside of the United States, or (b) the provision of the Services from any site outside of the United States ("**Outsourcing Taxes**"), the Parties will share equally financial responsibility for such Outsourcing Taxes, until such Outsourcing Taxes, together with incremental costs described in <u>Section 3.5(c)(iii)</u>, represent five percent (5%) or less of the then-current Base Charges, or ten percent (10%) or less, on a cumulative basis, of the Base Charges for the first Contract Year.  If the Outsourcing Taxes represent an increase in costs greater than five percent (5%) of the then-current Base Charges, or ten percent (10%) on a cumulative basis, of the then-current Base Charges in the first Contract Year, the Parties will negotiate appropriate equitable adjustments to the Fees, Resource Baselines or the Service Levels.  If the Parties are unable to agree on such adjustments, Gateway may terminate the affected portion of the Services (or all, if applicable) as of the date specified by Gateway in its notice of termination without payment of any Termination Fees.  Gateway shall pay Wind-Down Costs, if any, associated with the portion of the Services terminated by Gateway in accordance with this Section.

**19.3    Billing Identification.**  To the extent that any Tax is required by Law to be separately identified in Supplier's billings to Gateway, Supplier shall separately identify the Tax and assume any and all responsibility for non-compliance, including any additional tax, interest and penalty assessments, if Gateway fails to pay such Tax because it was not separately identified in Supplier's billings.

**19.4    Other Taxes.**  Gateway and Supplier shall each bear sole responsibility for all taxes, assessments and other real or personal property-related levies on its respective owned or leased real property.

**19.5    Segregation of Fees.**  Supplier shall segregate the Fees into the following separate payment streams: (a) those for taxable Services; (b) those for nontaxable Services; (c) those for which a sales, use or other similar tax has already been paid; and (d) those for which Supplier functions merely as a paying agent for Gateway in receiving goods, supplies or services (including leasing and licensing arrangements) that otherwise are nontaxable or have previously been subject to tax. In addition, Gateway and Supplier shall cooperate to (w) provide any information necessary and not otherwise reasonably available to determine accurately each Party's tax liability; (x) resolve tax issues raised upon audit by a Governmental Authority; (y) minimize such tax liability to the extent commercially reasonable and legally permissible, provided that neither Party will be required to take any position or action that (i) is inconsistent with advice given by such Party's internal or external advisors, or (ii) would result in an adverse tax or financial consequence to such Party. Each Party shall provide and make available to the other Party any resale certificates, information regarding out-of-state sales or use of equipment, materials or services, and any other exemption certificates or information requested by a Party.

**20.    AUDITS**

**20.1    Services.**  Upon at least five (5) calendar days' notice from Gateway, Supplier and Supplier Agents shall provide Gateway, Gateway Agents, and any of Gateway's regulators with access to (a) facilities where either Supplier or a Supplier Agent is performing Services, (b) Supplier Staff, and (c) data and records relating to the Services, as well as any assistance that

32

CONFIDENTIAL

they may require for the purpose of performing audits or inspections of the Services, the Service Locations, the Systems, and the business of Gateway relating to the Services (including to verify performance of the Services, the Fees, the use of Gateway resources in accordance with the terms of this Agreement, the conduct of Supplier's or Supplier Agents' operations and procedures, and the costs of Supplier in performing the Services, to the extent necessary to substantiate costs and expenses reimbursable by Gateway). If any audit by an auditor designated by Gateway, an Gateway Agent or a regulatory authority results in Supplier being notified that Supplier or a Supplier Agent is not in compliance with any Law or audit requirement, or indicates that there are any significant deficiencies in Supplier's or any Supplier Agent's internal control environment, or in the disclosure controls and procedures of Gateway, Supplier shall, and shall cause Supplier Agents to, (i) promptly take actions to comply with such Law or audit requirement (including as may be necessary to ensure that Gateway is in compliance with the applicable requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations thereunder promulgated by the United States Securities and Exchange Commission), and correct the significant deficiencies that are identified; and (ii) pay the reasonable fees of the audit. The five (5)-day notice period will not be applicable where extenuating circumstances require immediate access (e.g., legal or regulatory compliance), so long as Gateway provides notice as soon as practicable.

(a)     Without limiting the foregoing, if Gateway reasonably determines that a risk identified in any audit (i) would reasonably be considered a significant deficiency in Gateway's internal control environment (as such deficiency is characterized under the standards of the American Institute of Certified Public Accountants); (ii) would require Gateway to disclose the risk in accordance with Section 302 of the Sarbanes-Oxley Act of 2002; or (iii) would prevent Gateway from attesting to the effectiveness of its internal control environment pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, then Supplier will use all commercially reasonable efforts to resolve such risk within five (5) days after Gateway provides the audit report to Supplier.

20.2    Fees. Upon notice from Gateway, Supplier shall provide Gateway and Gateway Agents with access to such financial records and supporting documentation as may be requested by Gateway, and Gateway or Gateway Agents may audit the Fees to determine if such Fees are accurate and in accordance with this Agreement.

(a)     If, as a result of such audit, Gateway determines that Supplier has overcharged Gateway, Gateway shall notify Supplier of the amount of such overcharge and Supplier shall promptly pay to Gateway the amount of the overcharge, plus Interest calculated from the date of receipt by Supplier of the overcharged amount until the date of payment to Gateway. If an audit reveals that Supplier has undercharged Gateway, such Supplier may offset any undercharges that occur within the previous ninety (90) calendar days against any overcharges revealed in the same period.

(b)     In addition to Gateway's rights set forth in Section 20.2(a) above, if any audit reveals an overcharge to Gateway greater or equal to five percent (5%) of the monthly average Fees during the period being audited, Supplier shall reimburse Gateway for the reasonable costs of such audit.

420079 v9/HN
904v09!.DOC

CONFIDENTIAL

**20.3    SAS 70 Audit and Other Audits.** Supplier shall, at Supplier's expense, conduct an SAS 70 Type II audit of the IT Function annually and provide Gateway with the results of such audit in a form and format acceptable to Gateway and that enables Gateway to audit such results. In addition, Supplier shall make available promptly to Gateway the results of other reviews or audits conducted by or on behalf of Supplier and any Supplier Agents (including internal and external auditors) relating to the security or quality of any Services as agreed by the Parties from time to time. The Parties agree as of the Effective Date that reports to be made available to Gateway will include Supplier's SAS 70 and, to the extent available, ISO 9000 reviews, and Keane, Inc.'s semi-annual ISO 9001:2000 audit report.

**20.4    Record Retention.** Supplier shall retain a complete audit trail of financial and non-financial transactions resulting from or related to this Agreement, and all records and supporting documentation sufficient to satisfy the requirements set forth in this <u>Section 20</u> and to document the Services and the Fees paid or payable by Gateway under this Agreement in accordance with Gateway's retention policies and procedures as in effect from time to time, as required by Law, and in any event for at least seven (7) years after the later of the termination or expiration of this Agreement and the end of the Termination Assistance Period. A copy of Gateway's records retention policy in effect as of the Effective Date is attached hereto as <u>**Exhibit 29**</u>.

**20.5    Facilities.** Supplier shall provide to Gateway and Gateway Agents, on Supplier's premises (or, if the audit is being performed by a Supplier Agent, the Supplier Agent's premises if necessary), space, office furnishings (including lockable cabinets), and utilities as Gateway or such Gateway Agents may reasonably require to perform the audits described in this <u>Section 20</u>.

**20.6    Third-Party Auditors.** All external auditors and inspectors will be required to execute confidentiality agreements with Gateway or Supplier that contain terms substantially similar to those contained in <u>**Exhibit 25**</u>.

**20.7    General.** There is no restriction on the number or frequency of audits under this Section. Audits will be conducted in a manner that does not unreasonably interfere with Supplier's ability to provide the Services. If Supplier believes that an audit (or number of audits) is or is likely to have a direct affect on Supplier's ability to provide the Services, the Parties will address such concerns in accordance with the governance procedures set forth in this Agreement.

## 21.    CONFIDENTIALITY

**21.1    General.** All Confidential Information obtained from a Party will be treated as Confidential Information of the disclosing party in accordance with the provisions of the Mutual Non-Disclosure Agreement among the Parties, dated September 30, 2003 (the "**NDA**"), which is hereby incorporated by reference into this Agreement. A copy of the NDA is attached hereto as <u>**Exhibit 24**</u>. The Parties agree that all exchanges of Confidential Information, as well as the Use and disclosure of such information and materials pursuant to this Agreement, is subject to the terms and conditions of the NDA . Further, each Party agrees that it will treat the terms and conditions of this Agreement as the Confidential Information of the other Party. A breach of the NDA shall also be deemed a breach of this Agreement.

34

CONFIDENTIAL

**21.2    Attorney-Client Privilege.** Supplier recognizes that in the course of performing under this Agreement, it may obtain access to client documents, data and databases created by and for Gateway and associated communications related thereto (collectively, "**Privileged Work Product**") which are confidential attorney work product or subject to an attorney-client privilege to which Gateway is entitled. Supplier shall not reveal Privileged Work Product to third parties and Supplier shall institute adequate safeguards to prevent the unintentional disclosure of Privileged Work Product to third parties. The only Supplier Staff who may have access to Privileged Work Product shall be those for whom such access is necessary for the purpose of providing services to Gateway as provided in this Agreement. All Supplier Staff who shall need access to Privileged Work Product shall first sign and deliver to Gateway a confidentiality agreement satisfactory to Gateway. Supplier recognizes that Privileged Work Product has been prepared in anticipation of litigation and that Supplier is performing the Services with respect to Privileged Work Product as an agent of Gateway, and that all matter related thereto is protected from disclosure by Rule 26 of the United States Federal Rules of Civil Procedure (or any similar Law in other local jurisdictions). Should Supplier ever be notified of any judicial or other proceeding seeking to obtain access to Privileged Work Product, Supplier shall (a) immediately notify Gateway and (b) take such reasonable actions as may be specified by Gateway to resist providing such access. Gateway shall have the right and duty to represent Supplier in such resistance or to select and compensate counsel to so represent Supplier or to reimburse Supplier for reasonable attorneys' fees and expenses incurred in resisting such access.

## 22.    REPRESENTATIONS AND WARRANTIES

**22.1    By Gateway.** Gateway represents and warrants that:

(a)    Gateway is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware;

(b)    Gateway has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement;

(c)    the execution, delivery and performance of this Agreement by Gateway (i) has been duly authorized by Gateway and (ii) shall not conflict with, result in a breach of, or constitute a default under any other agreement to which Gateway is a party or by which Gateway is bound;

(d)    Gateway is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on Gateway's ability to fulfill its obligations under this Agreement;

(e)    Gateway is in compliance with all Laws applicable to Gateway's obligations under this Agreement and has obtained all applicable permits and licenses required of Gateway in connection with its obligations under this Agreement as of the Effective Date; and

35

CONFIDENTIAL

    (f)    there is no outstanding (or, to the best of Gateway's knowledge, pending or threatened) litigation, arbitrated matter or other dispute to which Gateway is a party that, if decided unfavorably to Gateway, would reasonably be expected to have a material adverse effect on Gateway's ability to fulfill its obligations under this Agreement.

    **22.2**    **By Supplier**. Supplier represents and warrants that:

    **(a)**    Supplier is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Nevada;

    **(b)**    Supplier has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement;

    **(c)**    the execution, delivery and performance of this Agreement by Supplier (a) has been duly authorized by Supplier and (b) shall not conflict with, result in a breach of, or constitute a default under any other agreement to which Supplier is a party or by which Supplier is bound;

    **(d)**    Supplier is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on Supplier's ability to fulfill its obligations under this Agreement;

    **(e)**    Supplier is in compliance with all Laws applicable to Supplier's obligations under this Agreement and has obtained all applicable permits and licenses required of Supplier in connection with its obligations under this Agreement as of the Effective Date;

    **(f)**    there is no outstanding litigation (or, to the best of Supplier's knowledge, pending or threatened), arbitrated matter or other dispute to which Supplier is a party which, if decided unfavorably to Supplier, would reasonably be expected to have a material adverse effect on Supplier's ability to fulfill its obligations under this Agreement;

    **(g)**    Supplier and Supplier Agents have full power and authority to grant Gateway the rights granted herein without the consent of any other party and any materials developed or furnished by Supplier and Supplier Agents to Gateway are free of any and all restrictions, settlements, judgments or adverse claims; and

    **(h)**    Supplier has not violated Gateway policies of which it is aware, or any Laws, regarding the offering of inducements in connection with this Agreement.

    **22.3**    DISCLAIMER. EXCEPT AS SPECIFIED IN SECTION 22.1 AND SECTION 22.2, NO PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE SERVICES OR ITS OBLIGATIONS HEREUNDER AND EACH EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**23.**    ADDITIONAL COVENANTS.

36

CONFIDENTIAL

**23.1    By Gateway.** Gateway covenants and agrees with Supplier that during the Term and the Termination Assistance Period, Gateway shall comply with all Laws applicable to Gateway. In addition, except as otherwise provided in this Agreement, Gateway shall obtain all applicable permits and licenses required of Gateway in connection with its obligations under this Agreement.

**23.2    By Supplier.** Supplier covenants and agrees with Gateway that during the Term and the Termination Assistance Period:

(a)    Supplier shall provide the Services with promptness, diligence and in a professional manner, in accordance with the practices and professional standards used in well-managed operations performing services similar to the Services, and Supplier shall use adequate numbers of qualified individuals with suitable training, education, experience and skill to perform the Services;

(b)    Supplier shall comply with all applicable Laws in the performance of this Agreement and shall obtain all applicable permits and licenses required of Supplier in connection with its obligations hereunder;

(c)    Supplier shall ensure that no viruses or similar items are coded or introduced into the Supplier Proprietary Software. Supplier shall use commercially reasonable efforts to ensure that no viruses or similar items are coded or introduced into the Systems. Supplier agrees that, in the event a virus or similar item is found to have been introduced into the Systems, Supplier shall promptly notify Gateway and will, at no additional cost to Gateway, assist Gateway in reducing or eliminating the virus or similar item and, if the virus or similar item causes an interruption in the Services or a loss of operational efficiency or loss of data, assist Gateway to the same extent to mitigate and restore such losses, including as specified in the Statement of Work;

(d)    Supplier shall ensure that no Supplier Proprietary Software used to provide the Services will include any code that would have the effect of disabling or otherwise shutting down all or any portion of the Services. Supplier shall use commercially reasonable efforts to ensure that no other Supplier Materials (including Supplier Third-Party Software) used to provide the Services will include any code that would have the effect of disabling or otherwise shutting down all or any portion of the Services. With respect to any disabling code that may be part of the Software used to provide the Services, Supplier will not invoke such disabling code at any time, including upon expiration or termination of this Agreement, without Gateway's prior consent;

(e)    neither Supplier nor any Supplier Agents shall make any unauthorized representations on Gateway's behalf or about Gateway, nor commit or bind Gateway other than as specifically authorized in writing;

(f)    Supplier will efficiently use the resources or services necessary to provide the Services, and to perform the Services in a cost-efficient manner, consistent with the required level of quality and performance and in accordance with the Service Levels set forth in **Exhibit 3**;

37

CONFIDENTIAL

(g)    the Commissioned Materials, Developed Materials, and all other materials and items provided by Supplier hereunder shall be free from material errors in materials, design, workmanship, operation and performance, shall comply with the applicable documentation and specifications, and shall provide the functions and features and operate in the manner described in the applicable Change Request Authorization, Work Order, or other documentation agreed to by the Parties for a period of (i) one (1) year following the installation, testing on Systems and acceptance of such materials by Gateway pursuant to the acceptance criteria specified in the applicable Change Request Authorization, Work Order, or other documentation; or (ii) for Supplier Materials or other items developed by Supplier during the Termination Assistance Period, for one (1) year from the end of the Termination Assistance Period;

(h)    the Commissioned Materials, Developed Materials, and the Derivative Works shall be free and clear of any liens (other than those arising by operation of Law), claims, charges, debts or other encumbrances;

(i)    the Software and any other Supplier Materials provided by Supplier under this Agreement are and will be capable of supporting the European Union euro as an additional currency; and

(j)    unless otherwise specified in a New Service Proposal, (i) if there is any defect or nonconformity in a Commissioned Material or a Developed Material, upon notice from Gateway, Supplier shall promptly, at its sole cost and expense, correct or replace any such defect or nonconformity; and (ii) if Supplier fails to do so within ten (10) calendar days from receipt of notice (or other time period agreed by the Parties), Gateway may at its option either obtain from Supplier any amounts reasonably expended to correct or replace such defect or nonconformity, or terminate the applicable New Service Proposal and obtain a refund of amounts paid for such Commissioned Materials or Developed Materials, as applicable; and

(k)    Supplier shall not, without Gateway's prior consent, incorporate any Supplier Commissioned Processes in any Supplier product offerings, or use any Supplier Commissioned Processes to provide services, to a Gateway Competitor, for at least one (1) year after Supplier notifies Gateway that it has completed such Supplier Commissioned Process.

24.    **DISPUTE RESOLUTION.**

    **24.1    Resolution Procedures.**  Except as otherwise provided below, the Parties shall attempt to resolve any dispute arising under or related to this Agreement (a **"Dispute"**) in accordance with the procedures set forth in this Section 24.1.

(a)    **Contract Managers.**  Within five (5) business days after either Party furnishes to the other notice of a Dispute, the Gateway Relationship Manager and Supplier Account Executive shall consider the Dispute in person or by telephone and shall attempt in good faith to resolve the Dispute for a period of ten (10) business days, except that if the Dispute relates to the amount or payment of Fees, the Gateway Relationship Manager and the Supplier Account Executive will attempt to resolve the Dispute within three (3) business days.  If the Dispute is not resolved, as agreed by the Parties in writing, within such ten (10) business-day

CONFIDENTIAL

period (or three (3) business-day period in the case of Fee Disputes), the Dispute shall be escalated and referred to senior executives in accordance with clause (b) below.

(b)    **Vice Presidents**. If a Dispute is not resolved in accordance with clause (a) above, a Vice President-level or higher executive of each of Gateway and Supplier shall consider the Dispute in person or by telephone and shall attempt in good faith to resolve the Dispute for a period of ten (10) business days, except that if the Dispute relates to amount or payment of Fees, such executives will attempt to resolve the Dispute within five (5) business days. Unless such executives otherwise agree in writing, either Party may pursue its rights and remedies under this Agreement after the expiration of such ten (10) business-day period (or five (5) business-day period in the case of Fee Disputes).

24.2    **Exclusions**. Notwithstanding the foregoing, no Dispute relating to Section 15.3 (Data), Section 21 (Confidentiality), or Section 27 (Indemnities) shall be subject to Section 24.1 above. In addition, nothing in this Agreement shall limit a Party's right to seek immediate injunctive or other equitable relief whenever the facts or circumstances would permit a Party to seek such relief in a court of competent jurisdiction. A Party seeking injunctive relief, which is not awarded in substantial part, will pay all reasonable costs and attorneys' fees of the other Party.

24.3    **Continuity of Services**. Supplier acknowledges that the timely and complete performance of its obligations pursuant to this Agreement is critical to the business and operations of Gateway. Accordingly, in the event of a Dispute, Supplier shall continue to so perform all of its obligations under this Agreement in good faith during the resolution of such Dispute unless and until (a) authority to do so is granted by Gateway or conferred by a court of competent jurisdiction, or (b) this Agreement is terminated in accordance with the provisions hereof.

25.    TERMINATION.

25.1    **Termination for Convenience**. Gateway may terminate this Agreement, in whole or in part, for convenience and without cause effective as of any time after the Effective Date by giving Supplier notice of the termination at least one hundred eighty (180) calendar days prior to the effective date of termination specified in the notice.

25.2    **Termination for Change in Control of Gateway**.

(a) In the event of a Change in Control of Gateway, Gateway may terminate this Agreement by giving Supplier notice of the termination at least ninety (90) calendar days prior to the termination date specified in the notice, and upon payment of the applicable Termination Fees, as described in **Exhibit 4**. Gateway may not exercise its right to terminate this Agreement pursuant to this Section 25.2 (a) more than one hundred eighty (180) days after the occurrence of the Change in Control.

(b) In the event of an MBO, and upon payment of Termination Fees specified in **Exhibit 4**, Gateway may terminate this Agreement by giving Supplier notice of the termination at least ninety (90) calendar days prior to the termination date specified in the notice. Gateway may not

39

CONFIDENTIAL

exercise its right to terminate this Agreement pursuant to this <u>Section 25.2 (b)</u> more than one hundred eighty (180) days after the occurrence of the MBO.

**25.3    Termination for Change in Control of Supplier or Supplier's Parent.** In the event of a Change in Control of Supplier or Supplier's Parent, Gateway may terminate this Agreement by giving Supplier notice of the termination at least ninety (90) calendar days prior to the termination date specified in the notice, and upon payment of the applicable Termination Fees specified in **Exhibit 4**. Within five (5) business days of the occurrence of a Change in Control of Supplier or Supplier's Parent, Supplier shall notify Gateway of the occurrence of such Change in Control. In the event that Gateway is so notified, Gateway may not exercise its right to terminate this Agreement pursuant to this <u>Section 25.3</u> more than one hundred eighty (180) days after the occurrence of a Change in Control of Supplier or Supplier's Parent, as the case may be.

**25.4    Termination for Cause**

(a)    If Supplier fails to perform any of its obligations under this Agreement in any material respect or repeatedly fails to perform any of its obligations under this Agreement and the cumulative effect thereof could reasonably be considered material, and, if curable, does not cure such breach within thirty (30) calendar days after receipt (the **"Supplier Default Cure Period"**) of a notice of breach from Gateway (the **"Supplier Default Notice"**), then Gateway may, without limiting Gateway's other rights or remedies under this Agreement, at law or in equity, by giving notice to Supplier, terminate this Agreement, in whole or in part, as of the termination date specified in the notice and without payment of any fee or reimbursement of any kind.

(b)    If Gateway fails to make undisputed payments due to Supplier and does not cure such default within thirty (30) calendar days after receipt (the **"Gateway Default Cure Period"**) of a notice of default from Supplier (the **"Gateway Default Notice"**), then Supplier may, by giving notice to Gateway, terminate this Agreement in whole, as of the termination date specified in the notice of default. The foregoing is the only circumstance in which Supplier may terminate this Agreement.

**25.5    Termination for Failure to Provide Critical Business Functions.** In the event of any of the following events, Gateway may, upon notice to Supplier, terminate this Agreement, as specified, and without payment of any Termination Fee or Wind-Down Costs, as of the date specified by Gateway in its notice of termination:

(a)    If Supplier incurs Service Level Credits equal to the At-Risk Amount, as measured by Function, for three (3) consecutive months, then Gateway may terminate such Function; or

(b)    If Supplier has three (3) or more Minimum Service Level Defaults within a six (6)-month rolling period for the same Critical Service Level, then Gateway can terminate the affected Function; or

CONFIDENTIAL

(c)    If there is a Minimum Service Level Default on thirty-five percent (35%) or more of all Service Levels (including Key Measurements and Critical Deliverables) in a given month, then Gateway can terminate the Agreement; or

(d)    If Supplier fails to meet any of the following Critical Service Levels or Critical Transition Milestones, Gateway may terminate the applicable Function:

(1.)    A scheduled payroll disbursement by one (1) calendar day or more;

(2.)    Accounts Payable disbursement error in excess of $35,000,000 at the end of any calendar quarter;

(3.)    Processing end user refunds other than in compliance with Federal Trade Commission guidelines for two (2) consecutive weeks (measured by average weekly cycle time); or

(4.)    Completing the Transition Plan more than thirty (30) calendar days after the agreed upon Cutover Date for a Function.

Gateway may not exercise its termination rights pursuant to this Section 25.5 more than ninety (90) calendar days after the occurrence of the event giving rise to such termination right.

## 26.    TERMINATION FEES

**26.1    Termination Fees. Exhibit 4** sets forth the Termination Fees that may be payable to Supplier if this Agreement is terminated pursuant to Section 25.1, Section 25.2 or Section 25.3. Any Termination Fees or Wind-Down Costs payable in accordance with **Exhibit 4** shall be due and payable on the End Date.

**26.2    No Other Termination Fees.** Except for the Termination Fees specified in **Exhibit 4**, and where the payment of Wind-Down Costs is specified in this Agreement, no termination fee or other charge (other than any charge due and payable under this Agreement) shall be payable by Gateway in connection with the termination of this Agreement, and any remedy sought by Supplier for such termination will be limited to the Early Termination Fee or Wind-Down Costs, as applicable. In addition, Supplier shall not charge Gateway more than once for any amount included in any fee owed pursuant to **Exhibit 4** that relates to any resource for which Supplier has already received or shall receive payment.

## 27.    TERMINATION ASSISTANCE AND EXIT RIGHTS

**27.1    Termination Assistance.** Upon Gateway's request at any time during the Termination Assistance Period, Supplier shall provide, and shall cause Supplier Agents to provide, all necessary assistance to allow the Services to continue without interruption or adverse effect and to facilitate the orderly transfer of the Services to Gateway or its designee (such designee, the "**Successor**") during the Termination Assistance Period, regardless of the reason for the termination, expiration or cessation of Services. The quality and level of performance of the Services during the Termination Assistance Period shall be consistent with the quality and level of performance of the Services during the Term generally, except as agreed by Gateway in

420079 v9/HN
904v09!.DOC

CONFIDENTIAL

connection with the winding-down of activities due to the termination or expiration of the Agreement.

**27.2    Payment.**  The Base Charges include all Termination Assistance Services provided by Supplier during the Term, and Supplier shall not charge Gateway any variable or other fees for such services.  For Termination Assistance Services provided by Supplier after the last day of the Term, Supplier shall provide such services (a) in the case of Termination Assistance Services that are Services, at the rates in effect for such Services immediately prior to termination or expiration of the Agreement or as may be set forth in <u>Exhibit 4</u>; and (b) for Termination Assistance Services for which no rates exist immediately prior to such termination or expiration, at Supplier's standard commercial rates then in effect, subject to discounts consistent with the discounts applied under the Agreement or Supplier's most favorable rates for similarly situated customers for service similar to the Termination Assistance Services, whichever is lower. Termination Assistance Services provided after the last day of the Term shall be subject to the provisions of the Agreement as such provisions would have been applicable to the Services prior to the effective date of termination or expiration.  After the expiration of the Termination Assistance Period, Supplier shall (y) answer questions from Gateway or Successor regarding the Services at Supplier's then standard billing rates and (z) deliver to Gateway or Successor any remaining Gateway-owned reports and documentation still in Supplier's possession.  If Gateway requests Termination Assistance Services after this Agreement has been terminated for Gateway's breach for non-payment of Fees due and payable hereunder (except as permitted under <u>Section 18.6</u>), Gateway shall pay for such Termination Assistance Services monthly in advance.

**27.3    Exit Rights**

**(a)    Return of Gateway Materials.**  At Gateway's request at any time during the Termination Assistance Period, Supplier shall, and shall cause Supplier Agents to, deliver to Gateway, at no cost to Gateway, a current copy of the Gateway Software, Gateway Tools, Gateway Data, Gateway Commissioned Materials and other Gateway Materials, as well as the Developed Materials in the form used to provide the Services as of the time of Gateway's request (including in object code and source code form in the case of any of the foregoing that are Software) or, if such request is made after the last day of the Term, then used to provide the Services as of the last day of the Term.  The rights granted to Supplier and Supplier Agents in <u>Section 14</u> shall immediately terminate on the End Date, and Supplier shall, and shall cause Supplier Agents to, destroy or erase all copies of the Gateway Software, Gateway Tools, Gateway Data, Gateway Commissioned Materials and other Gateway Materials then remaining in Supplier's or Supplier Agents' possession. An authorized officer of Supplier shall certify to Gateway that all such copies have been destroyed or erased.

**(b)    Supplier Materials.**  Supplier shall deliver to Gateway a copy of all or all Supplier Materials used to provide the Services (including the Developed Materials and the Supplier Commissioned Processes) upon Gateway's request.  Upon Gateway's request, Supplier shall provide to Gateway or Successor support and maintenance services for any Supplier Proprietary Software, Supplier Tools, or other Supplier Materials licensed to Gateway under this Agreement on terms, conditions, and prices agreed upon by Supplier and Gateway or Successor,

CONFIDENTIAL

as applicable, which shall in no event be less favorable to Gateway or Successor than Supplier's most favorable terms, conditions, and prices for such services provided to similar customers.

    (c)    **Supplier Third-Party Materials.**

    (i)    Supplier shall, and shall cause Supplier Agents to (a) assign to Gateway or Successor, at Gateway's option, the license agreements for which Supplier obtained assignment rights in accordance with Section 14 applicable to such Supplier Third-Party Materials, and (b) use their best efforts to transfer, assign or sublicense all Supplier Third-Party Materials not assigned under Section 27.3(a) above to Gateway or Successor at no cost such that (y) Gateway may Use, and sublicense to third parties the right to Use, such Supplier Third-Party Materials in connection with Gateway's use, provision (to itself) or receipt from Successor of services similar to the Services, or (z) Gateway or Successor may Use, and sublicense to third parties the right to Use, such Supplier Third-Party Materials in connection with the provision of Services or services similar to the Services to Gateway. Upon Gateway's request, Supplier shall assist Gateway or Successor in obtaining directly from third parties any Supplier Third-Party Materials or substitute therefor for which Gateway or Successor does not assume the applicable third-party agreements.

    (ii)    With respect to license agreements for Supplier Third-Party Materials subject to Section 27.3(c)(i)(b), Gateway shall bear the costs of obtaining any assignment or other permission necessary for Gateway to continue using such Supplier Third-Party Materials after the Termination Assistance Period (excluding any recurring maintenance or license fees).

    (d)    **Remote Access.** Upon Gateway's request, with respect to any Software, Tools or Processes used to provide the Services as of the time of Gateway's request, or, if such request is made after the last day of the Term, then used to provide the Services as of the last day of the Term, and that Supplier or Supplier Agents operate on Equipment located at one or more Supplier Service Locations, Supplier shall, and shall cause Supplier Agents to, provide to Gateway or Successor remote access to and use of such Software, Tools and Processes together with all hosting, maintenance, support and other services required for Gateway or Successor to use such Software, Tools and Processes to enable Gateway to receive Services or services similar to the Services after the last day of the Term, all on terms, conditions, and prices agreed upon by Supplier and Gateway or Successor, which shall in no event be less favorable to Gateway or Successor than Supplier's then-current standard terms, conditions, and prices for such services provided to similar customers.

    (e)    **Agreements.** Upon Gateway's request at any time during the Termination Assistance Period, Supplier shall, and shall cause Supplier Agents to, (i) assign to Gateway or its designee leases for some or all of the Equipment used primarily to provide the Services as of the last day of the Term; (ii) assign to Gateway any contracts for services provided by third parties and used to provide Services; and (iii) sell to Gateway, at the lesser of the Supplier's then-current book value or fair market value, some or all of the Equipment owned by Supplier or Supplier Agents and used primarily to provide the Services (and all user and other documentation in its possession that relates to such Equipment) free and clear of all liens, security interests or other encumbrances. Upon Gateway's request, Supplier shall, and shall cause Supplier Agents to,

CONFIDENTIAL

assist Gateway or Successor in obtaining directly from third parties any third-party services for which Gateway or Successor does not elect to assume the applicable third-party agreements.

**(f)    Network Services.**    To the extent that Supplier has incorporated Gateway's network into any Supplier network, Supplier shall, and shall cause Supplier Agents to, continue to provide up to two (2) years of continued network services after the End Date at the then current rates in the Agreement for such service as requested by Gateway, in order to permit Gateway or Successor to establish its own network in an orderly manner.

**(g)    Assets.**    Upon the expiration or termination of this Agreement by either Party for any reason, Gateway will have the option, at its sole discretion, to acquire from Supplier any Equipment, Software or other Supplier Materials purchased by Supplier or used by Supplier or Supplier Agents to provide the Services, or any portion thereof, at the lesser of fair market value or book value.

## 28.    INDEMNITIES.

**28.1    Indemnity by Gateway.** Gateway shall indemnify, defend and hold harmless Supplier and its Affiliates, officers, directors, employees, Approved Subcontractors, vendors, successors and assigns (the "Supplier Indemnified Parties") from and against, any Losses suffered, incurred or sustained by a Supplier Indemnified Party or to which a Supplier Indemnified Party becomes subject, resulting from, arising out of, or relating to any of the following:

**(a)**    any third-party claim arising out of or related to Gateway's performance or failure to perform its obligations prior to the Effective Date under any Assigned Agreements or Managed Agreements (or Gateway's performance of its obligations incurred under such Gateway Third-Party Contracts prior to the Effective Date, but which, by their terms, continue to apply to Gateway beyond the Effective Date (e.g., confidentiality)), or Gateway's failure to obtain, maintain or comply with any Governmental Approvals other than Supplier Governmental Approvals;

**(b)**    any claims arising out of or related to the inaccuracy, untruthfulness or breach by Gateway of any representation or warranty set forth in Section 22.1;

**(c)**    any claims arising out or related to of the Gateway's interview, hiring and/or personnel transfer processes or claims arising out of the employer-employee relationship (including termination) between Gateway and any Transitioned Personnel before his or her Start Date;

**(d)**    any claim of infringement or misappropriation of any patent, trade secret, copyright or other proprietary rights, alleged to have occurred because of Supplier or Supplier Agents' use (in accordance with the licenses granted hereunder) of Gateway Materials or other resources or items provided by Gateway in the course of providing the Services, except to the extent that such claims arise from any modifications made by or at the direction of Supplier or any Supplier Agents, or at such parties' direction, if the infringement or misappropriation claim would have been avoided but for such modifications;

44

CONFIDENTIAL

(e)    any third-party claim that does not arise out of or relate to a relationship with Supplier but arises from or relates to the actions of Gateway; and

(f)    any claim arising out of or relating to any amounts, including Taxes, assessed against Supplier that are the obligation of Gateway pursuant to <u>Section 19</u>;

(g)    any claim arising out of or relating to personal injury (including death and bodily injury) or real or personal property loss, damage or destruction resulting from Gateway's acts or omissions;

(h)    any claim arising out of or relating to a breach of <u>Section 21</u>;

(i)    relating to a breach of a Managed Agreement by Gateway; and

(j)    any claim arising out of or relating to a breach of any of the covenants in <u>Section 23.1</u>.

28.2    **Indemnity by Supplier.** Supplier shall indemnify, defend and hold harmless Gateway and its Affiliates, Authorized Users, officers, directors, Gateway Employees, subcontractors, vendors, successors and assigns (the "Gateway Indemnified Parties") from and against, any Losses suffered, incurred or sustained by a Gateway Indemnified Party or to which a Gateway Indemnified Party becomes subject, resulting from, arising out of, or relating to any of the following:

(a)    any third-party claim arising out of or related to the Supplier's (or Supplier's Agents') performance or failure to perform its obligations on or after the Effective Date under any Assigned Agreements or Managed Agreements, or Supplier's or Supplier's Agents' failure to obtain, maintain or comply with the Consents or any Supplier Governmental Approvals;

(b)    any claims arising out of or related to the inaccuracy, untruthfulness or breach by Supplier of any representation or warranty set forth in <u>Section 22.2</u>;

(c)    any claims arising out or related to of the Supplier's or Supplier's Agents' interview, hiring and/or personnel transfer processes or claims arising out of the employer-employee relationship (including termination) between the Supplier or a Supplier Agent and any Transitioned Personnel or Supplier Personnel after his or her Start Date;

(d)    any claim of infringement or misappropriation of any patent, trade secret, copyright or other proprietary rights, alleged to have occurred because of Supplier Materials, Systems, or other resources or items used by Supplier or provided by the Supplier or Supplier Agents to Gateway, or based upon Supplier's or Supplier's Agents' performance of the Services, except to the extent such claim arises from (i) any modifications made other than by or at the direction of Gateway or Gateway Agents, if the infringement or misappropriation claim would have been avoided but for such modifications; and (ii) to the extent that such materials are based upon specifications provided by Gateway, there is but one technique, and no alternatives, to implement such specifications, and the infringement or misappropriation would have been

45

CONFIDENTIAL

avoided but for the obligation to engage in the technique in order to fulfill the required specifications;

(e)     any claim arising out of or relating to the Services or this Agreement brought by a Supplier Agent or personnel thereof, except to the extent that such claim arises out of an act or omission of Gateway;

(f)     any third-party claim that does not arise out of or relate to a relationship with Gateway but arises from or relates to the actions of the Supplier or a Supplier Agent; and

(g)     any claim arising out of or relating to any amounts, including Taxes, assessed against Gateway that are the obligation of Supplier pursuant to Section 19;

(h)     any claim arising out of or relating to personal injury (including death and bodily injury) or real or personal property loss, damage or destruction resulting from Supplier's or Supplier Agents' acts or omissions;

(i)     any third-party claim arising out of or relating to Services or Systems provided by Supplier or Supplier Agents from a Service Location that is shared with other customers of Supplier;

(j)     any claim arising out of or relating to Supplier's breach of Section 10.3, 10.4, 10.5 or 16;

(k)     any claim arising out of or relating to a breach of Supplier's obligations with respect to Gateway Data (including Section 15);

(l)     any claim arising out of or relating to a breach of Section 21; and

(m)     any claim arising out of or relating to a breach of any of the covenants in Section 23.2(b) or (e).

(n)     **Obligation to Replace.**  If any use of the Services, any technology used to provide the Services, or any item provided to Gateway by Supplier or Supplier Agents, is, or in Supplier's opinion is likely to be, (1) subject to a of an infringement or misappropriation claim or proceeding; (2) found to infringe upon or misappropriate the Intellectual Property Rights of any third party; or (3) enjoined, Supplier shall promptly notify Gateway, and with Gateway's prior consent and at Supplier's own cost and expense and in such a manner as to minimize disturbance to Gateway's business activities, Supplier will:

(i)     obtain for Gateway the right to continue using the Services, any technology used to provide the Services, or any item provided to Gateway by Supplier or Supplier Agents; or

(ii)     modify the Services, any technology used to provide the Services, or any item provided to Gateway by Supplier or Supplier Agents, so that it is no longer infringing (provided that such modification does not adversely affect Gateway's intended use as contemplated by this Agreement); or

46

CONFIDENTIAL

(iii)    replace the Services, any technology used to provide the Services, or any item provided to Gateway by Supplier or Supplier Agents with a non-infringing functional equivalent.

(o)    In addition to the remedies set forth above, Supplier shall remain responsible for providing Services in accordance with this Agreement. If Supplier is unable to provide Services or to implement a work-around for the provision of Services, then Gateway may, upon notice to Supplier, obtain from a third party or itself provide those Services that Supplier failed to provide, and an equitable adjustment shall be made to the Fees.

**28.3    Indemnification Procedures.** If any third-party claim is commenced against a person or entity entitled to indemnification under Section 28.1 or Section 28.2 (the "**Indemnified Party**"), notice thereof shall be given to the Party that is obligated to provide indemnification (the "**Indemnifying Party**") as promptly as practicable. If, after such notice, the Indemnifying Party shall acknowledge that this Agreement applies with respect to such claim, then the Indemnifying Party shall be entitled, if it so elects, in a notice promptly delivered to the Indemnified Party, but in no event less than ten (10) calendar days prior to the date on which a response to such claim is due, to immediately take control of the defense and investigation of such claim and to employ and engage attorneys reasonably acceptable to the Indemnified Party to handle and defend the same, at the Indemnifying Party's sole cost and expense. The Indemnified Party shall cooperate, at the cost of the Indemnifying Party, in all reasonable respects with the Indemnifying Party and its attorneys in the investigation, trial and defense of such claim and any appeal arising therefrom; provided, however, that the Indemnified Party may, at its own cost and expense, participate, through its attorneys or otherwise, in such investigation, trial and defense of such claim and any appeal arising therefrom. No settlement of a claim that involves a remedy other than the payment of money by the Indemnifying Party shall be entered into without the consent of the Indemnified Party. After notice by the Indemnifying Party to the Indemnified Party of its election to assume full control of the defense of any such claim, the Indemnifying Party shall not be liable to the Indemnified Party for any legal expenses incurred thereafter by such Indemnified Party in connection with the defense of that claim. If the Indemnifying Party does not assume full control over the defense of a claim subject to such defense as provided in this Section, the Indemnifying Party may participate in such defense, at its sole cost and expense, and the Indemnified Party shall have the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of the Indemnifying Party.

**29.    DAMAGES.**

**29.1    Consequential Damages.** Except as set forth in Section 29.4 below, in no event shall either Gateway or Supplier be liable for any indirect, incidental, special, or consequential damages, arising out of or relating to its performance or failure to perform under this Agreement, even if advised of the possibility of such damages, and notwithstanding the failure of essential purpose of any limited remedy.

**29.2    Direct Damages.** Supplier shall be liable to Gateway for any direct damages arising out of or relating to Supplier's performance or failure to perform under this Agreement, which damages include (i) costs of reconstructing or reloading data; (ii) costs of implementing and performing work-arounds regarding a Service failure; (iii) costs of replacing lost, stolen or

47

CONFIDENTIAL

damaged goods or materials; (iv) costs to procure replacement services from an alternate source as a result of a failure to perform, to the extent in excess of the applicable Fees; (v) overtime, straight time and related expenses and allocated overhead (including travel, lodging, wages) as a result of a failure to perform; (vi) payments or penalties imposed by a governmental or regulatory body as a result of a failure to comply; and (vii) attorney's fees. Notwithstanding the foregoing, the liability of Gateway and Supplier, whether based on an action or claim in contract, equity, negligence, tort or otherwise, for any event, act or omission shall not exceed an amount equal to the aggregate of (a) Fees paid and payable to Supplier under this Agreement for the twelve-(12) month period preceding the date the claim arises (and if fewer than twelve (12) months have elapsed from the Effective Date, then twelve (12) times the average monthly Fees paid during the elapsed time since the Effective Date), plus (b) the Service Level Credits incurred to date by the Supplier on the date such damages are awarded.

**29.3    Basis of the Bargain.** Each Party acknowledges that the foregoing limitations are an essential element of the Agreement between the Parties and that in the absence of such limitations the pricing and other terms set forth in this Agreement would be substantially different.

**29.4    Exclusions.** The limitations or exculpations of liability set forth in <u>Section 29.1</u> and <u>Section 29.2</u> shall not apply to (a) the failure of (i) Gateway to make payments of Fees or (ii) Supplier to issue credits (including Reduced Resource Credits and Service Level Credits) or otherwise make payments due under this Agreement; (b) indemnification claims, as set forth in <u>Section 28</u>; (c) breaches of <u>Section 21</u>; (d) Supplier obligations with respect to Gateway Data (including <u>Section 15</u>); (e) liability resulting from the fraud, gross negligence, recklessness, or intentional or willful misconduct of a Party; or (f) damages occasioned by Supplier's wrongful termination of the Agreement, abandonment of work performed or to be performed, or willful refusal to provide the Services. The exculpations of liability set forth in <u>Section 29.2</u> shall not apply to cost of cover (including costs of reconstructing and loading data, costs of implementing work-arounds, costs to procure replacement products or services from an alternate source, overtime, straight time, and related expenses and allocated overhead (including travel, lodging, and wages) incurred by Gateway as a result of Supplier's breach of this Agreement.

**30.    INSURANCE.**

**30.1    Documentation.** Supplier shall provide to Gateway within ten (10) business days after the Effective Date evidence of all insurance required hereunder, and thereafter at any time any insurance policy covered in this <u>Section 30</u> is renewed, or upon request by Gateway, during the Term and the Termination Assistance Period (except with respect to "claims made" policies for which Supplier shall provide evidence of insurance for three (3) years after the End Date). The insurance companies providing such insurance must have an A.M. Best rating of A-VII or better. Gateway shall have the right to require Supplier to obtain the insurance required under this Section from another insurance carrier in the event Gateway determines that Supplier's then current insurance carrier does not have an A.M. Best rating of A-VII or better. All policies and certificates of insurance shall be written as primary policies with respect to Services performed and products supplied by Supplier and Supplier Agents and not written as policies contributing to, or to be used in excess of the Gateway insurance policies or any self-insurance program in which Gateway may participate with respect to such Services and products, unless due to the

48

CONFIDENTIAL

gross negligence or willful misconduct of Gateway. The provisions of this <u>Section 30</u> shall in no way limit the liability of Supplier. The obligations under this <u>Section 30</u> are mandatory; failure of Gateway to request certificates of insurance shall not constitute a waiver of Supplier's obligations and requirements to maintain the minimal coverages specified. Supplier shall maintain, in its files, evidence of all subcontractors' insurance coverage.

30.2 **Types and Amounts.** During the Term and the Termination Assistance Period, and at its own cost and expense, Supplier shall, and, except as agreed by Gateway, shall cause all subcontractors to, obtain and maintain the following insurance coverage:

(i)     Commercial General Liability insurance with a $1,000,000 per occurrence limit and an annual aggregate limit of not less than $2,000,000.

(ii)     Errors and Omission insurance in an amount not less than $10,000,000 per claim and not less than $10,000,000 in the aggregate.

(iii)     Product Liability insurance with a combined single and aggregate limit of $2,000,000.

(iv)     Workers' Compensation and Employer's Liability Insurance and other insurance as required by Law in all states in which the work shall be performed, or as may be required by federal Law. Coverage shall include Employers Liability with a limit not less that $1,000,000 for each occurrence.

(v)     Automobile Liability insurance covering vehicles used by Supplier in providing the Services, with a combined single limit of not less than $1,000,000.

(vi)     All risk Commercial Property Insurance covering all risk of physical loss or damage, including as a result of flood or earthquake, for the replacement value of any Gateway-owned property and papers on Supplier's premises or under Supplier's care, custody and control, as well as any and all Equipment to provide the Services. The Parties will develop an inventory of such property annually, or on a frequency otherwise agreed by the Parties.

(vii)     Employee Dishonesty and Computer Fraud Insurance with a combined single limit of $10,000,000.

(viii)     Umbrella or Excess Liability Insurance coverage with a combined single and aggregate limit of $25,000,000.

(ix)     If Supplier purchases "claims made" insurance, all acts and omissions of Supplier, shall be, during the Term and the Termination Assistance Period, "continually covered" notwithstanding the termination of this Agreement or the provisions of this Agreement allowing Supplier to purchase "claims made" insurance coverage. In order for the acts and omissions of Supplier to be "continually covered" there must be insurance coverage for the entire period commencing on the Effective Date of this Agreement and ending on the date that is at a minimum three (3) years after the End Date, and such insurance must satisfy the

49

CONFIDENTIAL

liability coverage requirements provided for in this Agreement. Supplier acknowledges and agrees that the provisions of this Section 30 may require Supplier to purchase "tail insurance" if its coverage lapses or "nose insurance" and/or "tail insurance" if Supplier changes insurance carriers, even after this Agreement is terminated.

**30.3    Policy Requirements.** Gateway shall be listed on Commercial General Liability and Umbrella Insurance policies obtained by Supplier and Supplier Agents as "Additional Insureds" up to the amount required of Supplier under this Agreement. Gateway shall be listed on Errors and Omission policies obtained by Supplier and Supplier Agents as a "loss payee" up to the amount required of Supplier under this Agreement. If a "claims made" policy is purchased, then Supplier shall also purchase adequate "tail coverage" for claims made against Gateway after such policy has lapsed or been canceled or this Agreement is no longer in effect. The provisions of Section 29.2 shall not be deemed to limit the liability of Supplier hereunder, or limit any rights that Gateway may have, including rights of indemnity or contribution.

**30.4    Providers of Non-Critical Services.** Notwithstanding Section 30.1, Section 30.2, or Section 30.3, and only with respect to Supplier Agents that provide only Non-Critical Services, Supplier shall be obligated only to cause such Supplier Agents to obtain and maintain insurance coverage that is standard in the industry for a provider of the type of service such Supplier Agent will provide in connection with this Agreement. "**Non-Critical Services**" means services performed by a subcontractor that do not require interaction between Gateway and such subcontractor (including its employees), that are performed in support of activities required in connection with providing the Services, that do not involve or require access to information regarding Gateway's customers or other Confidential Information of Gateway and that are performed outside of the Gateway Service Locations.

**30.5    Risk of Loss.** Supplier is responsible for the risk of loss of, or damage to, any property of Gateway at a Supplier Service Location, unless such loss or damage was caused by the acts or omissions of Gateway or a Gateway Agent. Gateway is responsible for the risk of loss of, or damage to, any property of Supplier at a Gateway Service Location, unless such loss or damage was caused by the acts or omissions of Supplier or a Supplier Agent.

**31.    MISCELLANEOUS PROVISIONS.**

**31.1    Assignment.** No Party shall, without the consent of the other Parties, assign this Agreement or any amounts payable pursuant to this Agreement, except that (a) a Party may assign this Agreement, in whole or in part, without such consent, to an Affiliate or another entity or business unit under common control with such Party, and or (b) Gateway may assign this Agreement, in whole or in part, without the consent of Supplier, pursuant to a Change in Control of Gateway, a reorganization of Gateway, or a transfer or sale of any business unit, line of business, product line, or substantial portion of its assets. Upon Gateway's assignment of this Agreement, Gateway shall be released from any obligation or liability under this Agreement. The consent of a Party to any assignment of this Agreement shall not constitute such Party's consent to further assignment. This Agreement shall be binding on the Parties and their respective successors and permitted assigns. Any assignment in contravention of this subsection shall be void.

CONFIDENTIAL

**31.2    Notices**. Except as otherwise specified in this Agreement, all notices, requests, consents, approvals, agreements, authorizations, acknowledgements, waivers and other communications required or permitted under this Agreement shall be in writing. Wherever under this Agreement one Party is required to give notice to the other, such notice shall be deemed effective:  (a) three (3) calendar days after deposit in the United States Mail, postage prepaid, certified or registered mail, return receipt requested; (b) one (1) business day after deposit with a national overnight courier; (c) if given by facsimile, that day such facsimile is sent, provided confirmation of such notice is also sent by national overnight courier or delivered in person; or (d) upon delivery if delivered in person or by messenger, in each case, addressed to the following addresses (or such other address as either party may be notified of as described above):

| | |
|---|---|
| To Gateway: | Senior Vice President and General Counsel<br>14303 Gateway Place<br>Poway, CA 92064<br>Fax No.: 858-848-2671 |
| With a copy to: | Law Department<br>Attn:  Contracts Manager<br>610 Gateway Drive<br>North Sioux City, SD 57049<br>Fax No.: 605-232-2612 |
| To GCI: | Senior Vice President and General Counsel<br>14303 Gateway Place<br>Poway, CA 92064<br>Fax No.: 858-848-2671 |
| With a copy to: | Law Department<br>Attn:  Contracts Manager<br>610 Gateway Drive<br>North Sioux City, SD 57049<br>Fax No.: 605-232-2612 |
| To Supplier: | Affiliated Computer Services, Inc.<br>Attn: Chief Operating Officer<br>2828 N. Haskell Ave.<br>Dallas, TX 75204<br>Fax No.: 214-584-5525 |
| With a copy to: | Affiliated Computer Services, Inc.<br>Attn:  General Counsel<br>2828 N. Haskell Ave.<br>Dallas, TX 75204<br>Fax No.: 214-584-5525 |

420079 v9/HN
904v09l.DOC

CONFIDENTIAL

A Party may change its address or telecopy number for notification purposes by giving the other Parties ten (10) calendar days' notice of the new address or telecopy number and the date upon which it shall become effective.

**31.3  Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single agreement between the Parties.

**31.4  Relationship.** The Parties intend to create an independent contractor relationship and nothing contained in this Agreement shall be construed to make the Parties partners, joint venturers, principals, agents (except as expressly set forth in Section 7) or employees of the other.  No officer, director, employee, agent, Affiliate or contractor retained by Supplier to perform work on Gateway's behalf under this Agreement shall be deemed to be an Employee, Agent or Contractor of Gateway. No Party shall have any right, power or authority, express or implied, to bind the other.

**31.5  Non-Exclusivity.** Nothing in this Agreement shall be construed as a requirements contract, and notwithstanding anything to the contrary contained herein, this Agreement shall not be interpreted to prevent Gateway from obtaining from third parties, or providing to itself, any of the Services described in this Agreement (whether Base Services, New Services, or otherwise) or services similar thereto.

**31.6  Consents, Approvals and Requests.** Except as specifically set forth in this Agreement, all consents and approvals to be given by a Party under this Agreement shall not be unreasonably withheld or delayed and each Party shall make only reasonable requests under this Agreement.

**31.7  Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to Law, then the remaining provisions of this Agreement, if capable of substantial performance, shall remain in full force and effect, and the Parties will endeavor in good faith to replace the unenforceable provision with a valid, legal and enforceable provision that reflects, as close as possible, the economic effect of the unenforceable provision.

**31.8  Waivers.** No delay or omission by a Party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by any Party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the Party waiving its rights.

**31.9  Timing and Cumulative Remedies.** Supplier acknowledges and agrees that time is of the essence with respect to its performance of its obligations under this Agreement.  No right or remedy herein conferred upon or reserved to a Party is exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy under this Agreement, or under applicable law, whether now or hereafter existing.  No Party shall be entitled to recover duplicative amounts regardless of whether such Party prevails on one or more causes of action.

420079 v9/HN
904v09!.DOC

CONFIDENTIAL

**31.10  Entire Agreement.** This Agreement (including the Exhibits hereto), the letter agreement between Gateway and Supplier of even date herewith and the NDA together represent the entire agreement among the Parties with respect to its subject matter, and there are no other representations, understandings or agreements between the Parties relative to such subject matter.

**31.11  Amendments.** No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by, in the case of Gateway, the Gateway Relationship Manager, and in the case of Supplier, the Supplier Account Executive.

**31.12  Survival.** The terms of the following sections shall survive the expiration or termination of this Agreement: 1, 3.4, 3.5, 3.7, 4.3(e), 4.4, 7, 10.3, 10.4, 10.5, 11, 12.4(e), 12.7, 14.1 through 14.4, 14.5 (b) and (c), 14.6 through 14.13, 15, 17.4, 18.1, 18.3, 18.4, 18.8, 19 through 24, 26 through 29, and 31.

**31.13  Third-Party Beneficiaries.** Except with respect to the Specified Affiliates, each Party intends that this Agreement shall not benefit, or create any right or cause of action in or on behalf of, any person or entity other than the Parties.

**31.14  Governing Law and Venue.** The rights and obligations of the parties under this Agreement shall be governed in all respects by the laws of the United States and the State of New York, without regard to conflicts of laws principles that would require the application of the laws of any other jurisdiction. The Parties intend that "best efforts" requires a greater level of effort, on the whole, than "commercially reasonable" or "reasonable" efforts; provided however, that in fulfilling its obligations to use "best efforts", a Party is not required to use efforts or expend amounts at levels that could reasonably be expected to result in substantial losses or endanger that Party's financial viability (for example, insolvency or bankruptcy).  Supplier agrees that it shall only bring any action or proceeding arising from or relating to this Agreement in a federal court in the Southern District of New York or in state court in New York County, New York, and Supplier irrevocably submits to the personal jurisdiction and venue of any such court in any such action or proceeding or in any action or proceeding brought in such courts by Gateway.  Supplier further irrevocably consents to the service of process from any of the aforesaid courts by mailing copies thereof by registered or certified mail, postage prepaid, to Supplier at its address designated pursuant to this Agreement, with such service of process to become effective thirty (30) calendar days after such mailing.

**31.15  Covenant of Further Assurances.** The Parties covenant and agree that, subsequent to the execution and delivery of this Agreement and, without any additional consideration, each of the Parties shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

**31.16  Bankruptcy.** The Parties acknowledge and agree that the intellectual property provisions of this Agreement constitute licenses of an intellectual property right by Supplier to Gateway as such term is used in Section 365(n) of Title 11 of the United States Code.

CONFIDENTIAL

**31.17 Export.** The Parties shall not knowingly export or re-export any personal computer system, part, technical data, sub-elements or personally identifiable data under this Agreement, directly or indirectly, to any destinations prohibited by the United States Government. The term "technical data" in this context, means such data as is defined as technical data by applicable United States export regulations.

**31.18 Conflict of Interest.** Supplier shall not pay any salaries, commissions, fees or make any payments or rebates to any Gateway Employee, or to any designee of such employee, or favor any Gateway Employee, or any designee of such Gateway Employee, with gifts or entertainment of significant cost or value or with services or goods sold at less than full market value. Supplier agrees that its obligation to Gateway under this Section shall also be binding upon Supplier Agents. Supplier further agrees to insert the provisions of this Section in each contract with a Supplier Agent.

**31.19 Diversity.** Gateway desires to use individuals and business entities of diverse race and ethnicity and from diverse backgrounds. In recognition thereof, Supplier shall use reasonable efforts to include on the Supplier Staff individuals that are of diverse race, ethnicity and background. In addition, Supplier shall use reasonable efforts to employ qualified minority vendors and subcontractors where appropriate and feasible in providing the Services. To the extent Supplier uses any qualified minority vendors or subcontractors or any providers that qualify as small, disadvantaged businesses, in Supplier's provision of the Services (i) Supplier shall advise Gateway in writing that such vendors or subcontractors are being used and the amounts paid to such vendors or subcontractors and (ii) Gateway may, at its option, and with notice to Supplier, include such payment amounts in the amount Gateway reports as having been paid by Gateway to minority qualified contractors and, in such event, Supplier shall not include any such payments to such vendors or subcontractors in any amount that Supplier reports as having been paid by Supplier to minority qualified contractors.

**31.20 Government Contracting Requirements.** Without limiting the generality of the requirements of any other provision in this Agreement, Supplier shall comply with applicable Laws related to the procurement of products, components thereof, or associated services by Governmental Authorities, including FAR 52.222-26 Equal Opportunity, FAR 52.222-36 Affirmative Action for Handicapped Workers, FAR 52.222-35 Affirmative Action for Special Disabled and Vietnam-era Veterans, and FAR 52.219-8 Utilization of Small Business Concerns.

**31.21 Publicity.** Each of Gateway and Supplier shall (a) submit to the other all advertising, written sales promotions, press releases and other publicity matters relating to this Agreement in which the other Party's name or mark is mentioned or which contains language from which the connection of such name or mark may be inferred or implied and (b) not publish or use such advertising, sales promotions, press releases or publicity matters, nor make any public disclosure regarding the terms and conditions of this Agreement or the business relationship between the Parties, as well as Supplier's Parent, without the other Party's prior consent. In the case of Gateway, any such consent must be given by Gateway's Senior Vice President of Partner Management and its Senior Vice President of Corporate Communications. A breach by either Gateway or Supplier of this Section 31.21 shall be deemed a material breach of this Agreement by the breaching Party that is not subject to cure.

54

CONFIDENTIAL

    **31.22  Good Faith and Fair Dealing**.  In entering into this Agreement, the Parties each acknowledge and agree that all aspects of the worldwide business relationship and dealings between the Parties contemplated by this Agreement shall be governed by the fundamental principle of good faith and fair dealing except as otherwise explicitly provided herein.

*[Remainder of Page Intentionally Left Blank]*

420079 v9/HN
904v09!.DOC

IN WITNESS WHEREOF, each of Gateway, GCI and Supplier has caused this Agreement to be signed and delivered by its duly authorized representative.

GATEWAY, INC.

By:

Name:  Roderick M. Sherwood NI

Title:    Executive Vice President and Chief Financial Officer

GATEWAY COMPANIES, INC.

By:

Name:  Roderick M. Sherwood NI

Title:    Executive Vice President and Chief Financial Officer

ACS COMMERCIAL SOLUTIONS, INC.

By:

Name:  Lynn Blodgett

Title:    Group President, Commercial Solutions

420079 v9/HN
904v09!.DOC